Leona S. SHULTS, Individually and as Stockholder on Behalf of Hornell Broadcasting Corporation, and all other similarly situated stockholders, Plaintiff,

v.

Charles D. HENDERSON, Hornell Broadcasting Corporation, Defendants.

Donald L. SELLERS, Plaintiff,

v.

Charles D. HENDERSON, Defendant.

Nos. 84 CV 504 T, 84 CV 535 T.

United States District Court, W.D. New York.

Jan. 7, 1986.

David J. Vergeront, Milwaukee, Wis., for plaintiff.

Kenneth R. Nowakowski, Milwaukee, Wis., for defendants.

Balok & Urbanski, Elmira, N.Y. by Raymond J. Urbanski, for plaintiffs.

Dadd & Dadd, P.C., Attica, N.Y. by Eric T. Dadd, for defendants.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Plaintiff Leona S. Shults ("Shults") sues "individually and as stockholder on behalf of Hornell Broadcasting Corporation ("HBC") and all other similarly situated stockholders" in an amended complaint charging defendants with violation of federal securities laws[1] and (in a pendent claim) of Section 717 of the New York State Business Corporation Law[2] and common law fraud and deceit.

---

1. *See infra* notes 5–8 and accompanying text.

2. Section 717 of the New York Business Corporation Law provides in pertinent part:

Directors and officers shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which ordinarily prudent men would

Defendant Charles D. Henderson ("Henderson") claims (i) there is no federal jurisdiction of plaintiffs' claims (ii) plaintiffs' claims are barred by the applicable statute of limitations, (iii) plaintiffs have failed to prove fraud, deceit or breach of fiduciary obligation, and (iv) plaintiffs have failed to show that she, he or any other stockholders sustained any damages.

A trial was held before the undersigned (without a jury) on October 28 and 29, 1985.

HBC is a New York corporation whose principal asset from its formation in the early 1950's until 1971 was radio station WLEA in Hornell, New York.

Defendant Henderson during the relevant times herein owned approximately 60% of the stock of HBC; plaintiff Shults owned approximately 18% of the stock, and plaintiff Donald Sellers ("Sellers") (whose separate complaint was dismissed from the bench during the trial as time-barred by the applicable statute of limitations) owned approximately 20% of the stock.

From the early 1950's through 1971, Henderson was president of HBC and directed and managed the affairs of WLEA. Henderson was also a New York State Assemblyman and for some time prior to and during 1970 he found it difficult to perform both jobs and the station was sustaining annual losses. In addition Mrs. Henderson, who worked at the station, became seriously ill, further complicating Henderson's ability to run the station.

In 1970 HBC had a part-time manager, Kevin Doran, working at the station. In late 1969 or early 1970 he first indicated to Henderson his interest in purchasing WLEA.

Shults's son David A. Shults, who is an attorney, testified that for some period of time he had on behalf of his mother attempted to determine the value of his mother's stock and that on April 23, 1970, Henderson telephoned him, asked if his mother would be willing to sell her shares to him and advised that the stock was not worth "a hell of a lot." David Shults replied that his mother would not do so.

Jerome Kornfeld ("Kornfeld"), the attorney for Henderson and HBC, testified that Henderson first communicated with him in August 1970, advising that he had a buyer for WLEA. Henderson stated that the purchase price was to be $80,000 and that he would receive a consulting contract for $70,000.

Kevin Doran testified that prior to the meeting in the Binghamton area on or about August 10, 1970, there had been no discussion of price but he identified certain notes (Ex. 29) which he had made prior to the meeting in which he indicated a proposed purchase price of $150,000 and his thought that he could put $15,000 down and pay the $135,000 balance over a ten-year period. He further testified that at the said meeting attended by Henderson and Kornfeld and his brother, Stanley Doran, representing him as his attorney, the figure of $150,000 came up. Stanley Doran, he said, was opposed to this price on the ground that it was "too much" and that Kevin Doran could not afford it. Henderson, Kevin Doran testified, then came up with the breakdown of $80,000 for the assets and $70,000 for a consulting agreement.

Stanley Doran testified that he was aware of the two and one-half times gross billings rule of thumb for valuation of a business and that the station's gross billings were almost $60,000. He was also aware of the $150,000 suggested price and was opposed to it because he did not think Kevin Doran could handle it financially. He knew Kevin Doran only had $15,000 in cash for a down payment.

Stanley Doran said Henderson asked for $150,000 and Stanley Doran's answer was "Forget it." Henderson then said "Give me $15,000, sign a ten-year note for $65,000 at 7% interest, and retain me at $7,000 per year for ten years or a total of $70,000." Stanley Doran asked his brother

exercise under similar circumstances in like positions.

N.Y.Bus.Corp.Law § 717 (McKinney 1963).

whether he could handle it, and Kevin Doran said "Yes." Kornfeld then said he would prepare the papers. Stanley Doran recalls that he asked Henderson whether this bound the other stockholders and Henderson said "Yes."

Both Kornfeld and Kevin Doran, however, said there was no discussion about minority stockholders' consent to the proposals.

Kornfeld returned to his office in Suffern, New York, drafted a proposed contract for the sale of HBC (Ex. 25) and a proposed contract that a consulting agreement for Henderson would be executed (Ex. 26). He mailed these drafts on August 14th to Stanley Doran and Henderson.

On November 9, 1970 a meeting of the HBC stockholders was held and attended by David Shults, Donald Sellers, and Mr. and Mrs. Henderson. David Shults was not aware on that date of any prior negotiations for the sale of the station. At the meeting Henderson indicated that HBC had been losing money for some time and that he was too busy to run it. Henderson did not say that he had a potential buyer but rather said that $60,000 was a fair price for the station. He did say that he thought Kevin Doran might be interested, and asked for authority to negotiate the sale of the station. Accordingly, the stockholders agreed to the following, as reflected in the meeting minutes: (1) that serious consideration be given to the sale of the station; (2) that $60,000 be the fair minimum asking price; and (3) that Henderson be authorized to seek a buyer (Ex. 9).

Two days after the stockholders' meeting the option contract for the sale of the assets of HBC was signed (Ex. 17). Kornfeld mailed an amended draft of the consulting agreement to Stanley Doran on November 17, 1970, which was to take effect when, as and if the Federal Communications Commission ("FCC") approved the purchase (Ex. 27).[3]

The next stockholders' meeting was noticed for May of 1971 and with the same stockholders present Henderson indicated that he had negotiated a sale of the assets of HBC for $80,000 with $15,000 down and the balance over a ten-year period at 7%. Nothing was said with respect to Henderson's management consulting agreement.

At about the same time, in 1971, Kevin Doran formed Patricus Enterprises, Inc. ("Patricus"), which entity purchased the assets of HBC on November 10, 1971, with a $15,000 down payment and the execution of a ten-year note for $65,000 at 7% interest. The final version of the management consulting agreement was executed on June 1, 1972 (Ex. 20). This agreement provided for payments of $7,000 annually for ten years to Henderson in return for his performance of various consulting services to Patricus. In the event of Henderson's death payments would cease following three additional monthly installments.

David Shults testified that he learned a couple of years later that the sale had been completed but never saw the contracts or other paperwork in connection therewith.

During the ensuing ten years Henderson performed services for Patricus pursuant to the agreement, among which were advice and consultation, continued maintenance and solicitation of advertising accounts and the broadcast of weekly radio programs.

In 1974 or 1975 Sellers, at a point when he was working for Henderson, came across a legal bill to HBC for the sale of the assets (Ex. 21) and a legal bill to Henderson for the consulting contract (Ex. 22), and a handwritten memorandum prepared by Kevin Doran prior to the August meeting (Ex. 29), in files belonging to Henderson. Sellers consulted an attorney in 1978 with the thought of pursuing a legal action against Henderson and HBC but no action was taken at that time.

David Shults testified that on December 16, 1983, he received a call from Sellers

---

**3.** As hereinafter indicated the FCC conditioned its approval of the transfer of the station license on the execution of a revised "managerial" consulting agreement with Henderson because of Kevin Doran's lack of managerial experience (see *infra* at p. 1426).

inquiring whether David Shults had received a call from Henderson about selling his shares. Sellers added that he had evidence that the true purchase price was not $80,000 but $150,000. Sellers thereafter forwarded to David Shults Exhibits 21, 22 and 29.

Sellers eventually commenced his present action in May 1984, at least nine years after he had discovered what he now claims is actionable conduct on the part of Henderson. In view of these particular facts the Court dismissed Sellers' complaint as barred by the applicable statute of limitations when such facts emerged during the course of the trial.[4]

Plaintiff Shults' claims are not so time-barred, however, because she had no information with respect to the fraud until December 16, 1983, and commenced her action relatively promptly thereafter.[5]

**4.** The applicable limitations period under the federal securities laws is "one year after the discovery of the untrue statement or the omission." 15 U.S.C. § 77m (1981). The New York statute of limitations for fraud actions is six years "computed from the time the plaintiff or the person under whom he claims discovered the fraud, or could with reasonable diligence have discovered it." N.Y.Civ.Prac.Law § 213(9) (McKinney 1972). Thus, Sellers, who discovered the fraud in 1974 or 1975, was barred from bringing an action in federal court in 1975 or 1976 and barred from bringing a State court action in 1980 or 1981.

**5.** Shults' complaint is dated May 1, 1984, within five months of David Shults' discovery of the deceit.

**6.** That section provides in pertinent part:
(a) The district courts of the United States, and the United States courts of any Territory, shall have jurisdiction of offenses and violations under this subchapter and under the rules and regulations promulgated by the Commission in respect thereto, and concurrent with State and Territorial courts, of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter. Any such suit or action may be brought in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendant participated therein, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

## I.

## JURISDICTION

The Court's jurisdiction in this case is predicated on Section 22 of the Securities Act of 1933 ("the '33 Act"), codified at 15 U.S.C. § 77v,[6] and Section 27 of the Securities Exchange Act of 1934 ("the '34 Act") (15 U.S.C. § 78aa),[7] and Rule 10b–5 promulgated in connection therewith (17 C.F.R. § 240.10b–5).[8] Defendant argues that the ten-year note given by Patricus for $65,000 at 7% interest per annum secured by both a chattel mortgage and a real property mortgage is not a security within the meaning of such statutes but rather a "cash substitute." In connection with this argument defendant also argues that there is no proof of any "purchase or sale" of a security.[9]

**6.** 15 U.S.C. § 77v (1981).

**7.** That section provides in pertinent part:
The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder.
15 U.S.C. § 78aa (1981).

**8.** Rule 10b–5 reads as follows:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artiface to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5 (1985).

**9.** Section 3(a)(13) of the '34 Act (15 U.S.C. § 78c(a)(13)) defines "purchase" to include "any contract to buy, purchase or otherwise acquire." The succeeding section defines "sale" as includ-

Defendant not only overlooks the controlling cases in this Circuit, which liberally interpret a "security" within the meaning of the federal securities laws and which hold that kickbacks or commissions paid in connection with the exchange of a security fall within the ambit of Rule 10b–5, *see, e.g., Hoff v. Sprayregen*, 339 F.Supp. 369, 373 (S.D.N.Y.1971), but also the significant features of this particular transaction.

#### A. *The Applicable Caselaw*

Despite slight differences in wording between the '33 and '34 Acts, courts have treated the definitions of "security" in the two statutes as functional equivalents. *See Tcherepnin v. Knight*, 389 U.S. 332, 335–36, 88 S.Ct. 548, 552–553, 19 L.Ed.2d 564 (1967); *Securities and Exchange Commission v. Diversified Industries, Inc.*, 465 F.Supp. 104, 107 (D.D.C.1979). Section 3(a)(10) of the '34 Act (15 U.S.C. § 78c(a)(10)) provides in pertinent part that "[t]he term 'security' means any note, ... investment contract ... for a security or in general, any instrument commonly known as a 'security'; ... but shall not include ... any note ... which has a maturity date at the time of issuance of not exceeding nine months...."

By offering that loosely-phrased definition Congress declined to articulate precise relevant economic criteria for distinguishing a security from a nonsecurity. Rather Congress painted the term with a broad brush in order to embrace within its meaning the infinite variety of financings that fall within the concept of a security. *See* H.R.Rep. No. 85, 73d Cong., 1st Sess., 11 (1933). In applying the Legislature's language the Circuits have adopted different tests. The Second Circuit has taken the broadest approach in determining whether a note constitutes a security under the federal securities laws. In *Exchange National Bank of Chicago v. Touche Ross & Co.*,

544 F.2d 1126 (2d Cir.1976), Judge Friendly offered the following guidance:

> The 1934 Act says that the term "security" includes "any note ... [excepting one] which has a maturity at the time of issuance of not exceeding nine months," and the 1933 Act says that the term means "any note" save for the registration exemption in § 3(a)(3). These are the plain terms of both acts, to be applied "unless the context otherwise requires." A party asserting that a note of more than nine months maturity is not within the 1934 Act (or that a note with a maturity of nine months or less is within it) or that any note is not within the anti-fraud provisions of the 1933 Act has the burden of showing that "the context otherwise *requires.*" (Emphasis supplied.) One can readily think of many cases where it does—the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized). When a note does not bear a strong family resemblance to these examples and has a maturity exceeding nine months, § 10(b) of the 1934 Act should generally be held to apply.

*Id.* at 1137–38 (footnotes omitted).

#### B. *The Law Applied to the Facts*

■ The note in this case does not "bear a strong family resemblance" to any of Judge Friendly's examples. Henderson owned 60% of the stock of HBC and he was the chief executive officer and in complete control thereof. He structured the ulti-

---

ing "any contract to sell or otherwise dispose of." 15 U.S.C. § 78c(a)(14). These terms are to be broadly construed to properly effectuate the purpose of the Act. *See First National Bank of Las Vegas, New Mexico v. Estate of Russell,* 657 F.2d 668, 673 (5th Cir.1981). This Court having

heard the testimony and reviewed the exhibits in this case concludes that there is sufficient evidence to warrant the finding that there was a purchase or sale within the meaning of the federal securities laws. *See* Pl.'s Exs. 20, 25–28 and Def.'s Ex. A.

mate deal in the way most profitable to, and most protective of, his majority interest in the corporation. At the conclusion of the negotiations, he took back, on behalf of HBC, a ten-year note at 7% interest secured by virtually all of the property of the Patricus corporation and a consulting agreement, both of which, *i.e.*, the note and the consulting agreement, put HBC and him in the position of having first right to profits of the station for the ensuing ten years. This combination was unquestionably a ten-year investment in the hoped-for profitability of the WLEA station, and it was taken by defendants HBC and Henderson in exchange for the assets of HBC.[10] Stated another way, Patricus purchased the assets of HBC with such a combination of the note and mortgages as well as the consulting agreement. Under the circumstances the note and mortgages may not be said to be anything but a security within the meaning of the federal securities Acts.

■ Moreover, there is no question but that the alleged "misrepresentations" and "omissions" by Henderson pertained to the value of the note or security itself. *Cf. Chemical Bank v. Arthur Anderson & Co.*, 726 F.2d 930 (2d Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984) (holding that the same must pertain to the value of the security and where the facts indicated they did not). Plaintiff alleges that Henderson defrauded the buyer (HBC) as to the value of an available note when he failed or omitted to advise it of the full and fair value of the same, which plaintiff claims was the equivalent of the note plus the interest-free $70,000 ten-year installment amount, or a ten-year note of $135,000 at a rate of interest slightly under 3½%.

## II.

## FRAUD, DECEIT, NONDISCLOSURE AND BREACH OF FIDUCIARY DUTY

■ Defendant Henderson argues that only if his consulting agreement "was a sham" may a claim be made that there was a duty on his part to disclose the facts with respect to the same to the minority stockholders in HBC. While this might be true, if, some two years after the sale of the assets had occurred, Patricus had for the first time commenced and thereafter completed negotiations for a separate consulting agreement with Henderson, it is not the case here. Given the facts recited above where the negotiations for the sale of the assets were so completely intertwined with the negotiation for the consulting agreement, full disclosure of all of such facts was required by Henderson to all of the minority stockholders at or before the November 1970 meeting. Not to have done so, as was the case here, constituted a fraud and deceit within the meaning of Rule 10b–5 and the indicated federal securities laws, as well as a common law fraud, deceit[11] and breach of fiduciary obligation on the part of Henderson. *See Hoff v. Sprayregen, supra,* at 374.

Whether or not plaintiff or any other minority stockholder sustained any damage as a consequence thereof is a separate question.

## III.

## DAMAGES

■ The present day action of deceit derives from the older action on the case and continues the requirement that the plaintiff must have suffered substantial

---

10. Because the profitability of the WLEA station hinged to a large extent on the efforts of Kevin Doran, the sale may also be said to resemble an investment contract which "for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of … a third party." *Securities and Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946).

11. The six elements of common law deceit are: (1) false representation or nondisclosure of (2) a material (3) fact; (4) the defendant must know of the falsity causing (5) the plaintiff to justifiably rely and (6) suffer damage as a consequence. L. Loss, *Fundamentals of Securities Regulation*, p. 809 (1983).

damage before a cause of action will lie. Nominal damages are not awarded in deceit. *See, e.g., Castelli v. Abramo*, 12 Misc.2d 145, 148, 176 N.Y.S.2d 525, 529 (N.Y.Mun.Ct.1956), and cases cited therein. If the plaintiff is not materially harmed by the defendant's conduct, however flagrant it may have been, there may be no recovery. *See* W. Prosser & W. Keeton, *The Law of Torts*, p. 765 (5th ed. 1984). Nor are punitive damages available for ordinary fraud under New York law. *Walker v. Sheldon*, 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 491, 179 N.E.2d 497, 498–99 (1961) (punitive damages awarded only "where the fraud, aimed at the public generally, is gross and involves high moral culpability.").

█ Similarly, under Rule 10b–5 no recovery may be had absent proof of damages. Section 28(a) of the '34 Act, codified at 15 U.S.C. § 78bb(a), the Act under which the Rule was promulgated, denies recovery to a plaintiff for any amount "in excess of his actual damages on account of the act complained of." *Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303, 1313 (2d Cir.1977) (citation omitted).

█ The facts in this case reveal that plaintiff's and other minority stockholders' reliance (if any) on Mr. Henderson's conduct was in no way detrimental to their pecuniary interests. There is no question but that Henderson performed substantial services for Patricus during the ten-year period of his consulting agreement. Indeed, according to Kevin Doran, Henderson complied with all Kevin Doran's requests. He sold advertising, called on and pursued national accounts and agencies, and gave managerial advice to Kevin Doran at least at the start of the contract. Moreover, the station made sufficient funds in each year to meet the periodic payments as they became due on the ten-year note and most of the ten-year payments to Henderson in a timely fashion.

The proof with respect to the hours and the value of the hours spent by Henderson in the performance of such services was not adduced during the trial with any degree of precision and normally this would present a problem to the Court as trier of the facts in this matter. The crucial consideration here, however, appears to be the fact that the FCC would not have issued its approval of the transfer of the franchise from HBC to Patricus unless Kevin Doran entered into the management consulting contract which was ultimately signed with Henderson. In other words, without the contract and the services to be performed thereunder there would have been no deal in this case and the minority stockholders would have been left with their station, which was losing money and which they themselves agreed had a value of approximately $60,000 in November of 1970. In fact HBC, of course, received $80,000, or $20,000 more than the agreed upon value.

Under the circumstances, it is difficult for this Court to understand how Shults or any other stockholder has been damaged by the actions and steps taken by Henderson (no matter how theoretically fraudulent, deceitful and in breach of his fiduciary obligations the acts may have been).[12]

In sum, plaintiff Shults and the other minority stockholders would appear to be entitled to no damages and this Court so finds and dismisses plaintiff's complaint. The Court awards no costs and no attorneys' fees in this action.

SO ORDERED. Submit judgment.

---

**12.** Even assuming *arguendo* that the consulting agreement was a "sham" (which it clearly was not), the minority stockholders' interest in the $70,000 paid in equal installments of $7,000 *per annum* between 1972 and 1982 would have been at best 41% of the discounted value of such $70,000 as of November 10, 1971, *i.e.*, approximately $13,600, which, of course, would have been paid to HBC at least until all debts of the corporation had been satisfied.