**COMMONWEALTH BANK & TRUST CO., Plaintiff,**

v.

**SPECTRUM LEASING CORPORATION, Defendant.**

Civ. No. 87–1331.

United States District Court, M.D. Pennsylvania.

Aug. 1, 1989.

Michael J. Devlin, Jr., James A. Willhite, Jr., Matthew A. Cartwright, and Montgomery, McCracken, Walker and Rhoads, Philadelphia, Pa., for plaintiff.

C. Edward S. Mitchell, Mitchell, Mitchell, Gray and Gallagher, Williamsport, Pa. and Michael C. Montavon, Montavon & Vanderpool, Fairfax, Va., for defendant.

## OPINION

MUIR, District Judge.

### I. *Introduction.*

On September 24, 1987, Commonwealth Bank & Trust Co., N.A. ("Commonwealth") filed a complaint against Spectrum Leasing Corporation ("Spectrum") and Baker, Watts & Co. ("Baker, Watts") alleging violations of federal and state securities laws and federal racketeering laws. The complaint also alleged common law claims of fraud and deceit, negligence, tortious conversion, and breach of contract. On November 17, 1987, Spectrum and Baker, Watts filed motions to dismiss Commonwealth's complaint. On March 15, 1988, this Court issued an opinion and order granting both motions and ordering Commonwealth's complaint dismissed. On June 29, 1988, this Court issued an order permitting Commonwealth to file an amended complaint. On July 13, 1988, Commonwealth filed its amended complaint. Spectrum and Baker, Watts both filed motions to dismiss the amended complaint, and on October 27, 1988, we granted those motions in part and denied them in part and granted Commonwealth leave to file a second amended complaint. On November 15, 1988, Commonwealth filed its second amended complaint.

On May 10, 1989, Spectrum filed a motion for summary judgment with respect to Counts I and II of Commonwealth's second amended complaint. On May 22, 1989, Spectrum filed a brief in support of its motion. On June 6, 1989, Commonwealth filed its brief in opposition to Spectrum's motion for summary judgment. On June 22, 1989, Spectrum filed its reply brief. On June 30, 1989, Commonwealth filed a motion for leave to submit a surreply brief. By order dated July 5, 1989, we directed expedited briefing on the question of whether Commonwealth should be permitted to file a surreply brief, and stayed our decision on Spectrum's motion for summary judgment pending our ruling on Commonwealth's motion to file a surreply brief. On July 10, 1989, Spectrum filed its brief in opposition to Commonwealth's motion for leave to submit a surreply brief. On July

13, 1989, Commonwealth submitted its reply brief in support of its motion. By order dated July 21, 1989, we granted Commonwealth's motion for leave to submit a surreply brief. On July 26, 1989, Commonwealth filed its surreply brief. Spectrum's motion for summary judgment on Counts I and II of Commonwealth's second amended complaint is now ripe for disposition.

On July 14, 1989, Commonwealth, Baker, Watts & Spectrum filed a stipulation for dismissal in which they agreed that all claims asserted by Commonwealth against Baker, Watts should be dismissed with prejudice and that Count VII of the second amended complaint should be dismissed in its entirety with prejudice. By order dated July 18, 1989, we approved the stipulation for dismissal, thereby dismissing Baker, Watts as a party to this action.

## II. *Facts.*

On August 27, 1984, Spectrum entered into a contract with the United States General Accounting Office ("GAO") for the lease, with option to purchase, and maintenance of up to 800 "microcomputers" and related computer equipment. (Second Amended Complaint, ¶ 9). Spectrum retained Baker, Watts to assist it in obtaining financing to acquire computer and data processing equipment from Seequa Computer Corporation. (Second Amended Complaint, ¶¶ 12, 13). In November, 1984, Baker, Watts solicited from Commonwealth's commercial loan department financing for Spectrum's acquisition of computer equipment to be leased to the GAO. (Second Amended Complaint, ¶¶ 14, 15). Commonwealth subsequently wired money to Spectrum's account in the amounts of $418,068.52 in November, 1984, $45,617.27 in December, 1984, and $18,649.63 in March, 1985, totalling $463,685.79. (Second Amended Complaint, ¶¶ 17-22).

Financing by Commonwealth for Spectrum's acquisition of computer equipment was memorialized through various "Assignment and Security Agreements" between Commonwealth and Spectrum. (Spectrum Exhibits 1, Tab 1; 2; and 3). In consideration for funds provided by Commonwealth, Spectrum agreed to forward monthly checks that represented a portion of the GAO's lease payments. (Second Amended Complaint, ¶¶ 17, 20, 22). The payments were to be made over a period of 36 months and 15 days, and Spectrum was to provide Commonwealth with a policy of "cancellation insurance" written by Great Global Assurance Co. (Second Amended Complaint, ¶¶ 17, 20, 22). In addition, the assignment agreements between Commonwealth and Spectrum gave Commonwealth a security interest in equipment leased by Spectrum to the GAO and provided that Commonwealth's only recourse in the event of default was to proceed against the collateral. (Spectrum Exhibits 1, Tab 1; 2; and 3).

On April 26, 1985, the GAO sent a letter to Spectrum advising it that Spectrum had failed to perform its obligations under the leasing contract and that the GAO would terminate the contract for cause. (Second Amended Complaint, ¶ 25). On October 15, 1985, Spectrum advised Commonwealth that the GAO had determined as of September 30, 1985, not to renew its contract with Spectrum. (Second Amended Complaint, ¶¶ 26-27). On February 27, 1986, an Arizona court declared Great Global Assurance Co. insolvent, and a receiver advised all claimants to proceed against their respective state insurance guarantee funds for payment. (Second Amended Complaint, ¶ 28). Thereafter, Spectrum submitted a claim to the Virginia Property and Casualty Insurance Guaranty Association ("Virginia Casualty") with respect to the Great Global insurance policies. (Second Amended Complaint, ¶ 28). In January, 1987, Virginia Property and Casualty Insurance Guaranty Association rejected Spectrum's claims. (Second Amended Complaint, ¶¶ 28, 29).

In its Second Amended Complaint, Commonwealth alleges that it purchased "investment contracts" from Spectrum after being encouraged to purchase them by Baker, Watts. In Counts I and II of its second amended complaint, Commonwealth alleges violations of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*, the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),

and common law fraud, deceit, and negligence. Spectrum's motion seeks summary judgment with respect to these two counts only.

## III. *Discussion.*

In considering a motion for summary judgment, we must ascertain, on the basis of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, whether or not there are any genuine issues of material fact and, if none, whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Peterson v. Lehigh Valley District Council,* 676 F.2d 81, 84 (3d Cir.1982). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hanks v. Temple University,* 829 F.2d 437, 440 (3d Cir.1987); *Equimark Community Finance Co. v. C.I.T. Financial Services Corp.,* 812 F.2d 141, 144 (3d Cir.1987). If evidence is merely colorable or not significantly probative, summary judgment must be granted in favor of the movant. *Anderson,* 106 S.Ct. at 2511. When the record, taken as a whole, could not lead one to find for the non-moving party, summary judgment must be entered in favor of the movant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In our order of October 27, 1988, we noted that to satisfy the investment contract definition of a security a transaction must include (1) the presence of an investment (2) in a common venture (3) premised on a reasonable expectation of profits (4) that are derived from the entreprenurial or managerial efforts of others. *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). We also noted that in this Circuit the "common venture" element of a security requires a showing that funds were "pooled" and that the fortunes of each investor in the pool are tied to the success of the overall venture. *Salcer v. Merrill Lynch, Pierce, Fenner & Smith,* 682 F.2d 459, 460 (3d Cir.1982). We concluded, in part, that Commonwealth's amended complaint alleged sufficient facts to survive a motion to dismiss its securities law counts because it claimed that Spectrum had "pooled" the funds of several investors to support its contract with the GAO. (Order of October 27, 1988, at 8–9). With Spectrum's motion for summary judgment we have received documentation, depositions, and new arguments by the parties which lead us to conclude that the requirement of pooling has not been satisfied in this case.

Spectrum argues in its brief in support of its motion that Commonwealth was assigned a right to payments from the GAO–Spectrum Lease Agreement in three separate transactions and that in each Commonwealth was the sole assignee. (Spectrum Brief in Support at 13). Commonwealth responds by arguing that Spectrum entered into 31 such assignments with other "investors," that the funds forwarded by these "investors" were commingled into a single operating account, and that the fortunes of each investor depended upon Spectrum performing its underlying lease agreement with each Government agency (Commonwealth Brief in Opposition at 6–7). Commonwealth does not argue that each of the 31 "investors" solicited by Spectrum had an interest in the GAO contract, or that the fortunes of any other investor depended upon Spectrum's performance of the GAO contract, but it argues instead that Spectrum cannot avoid the securities laws by assigning individual investors' discrete interests in its business operations. (Commonwealth Brief in Opposition at 15).

Initially, we note that use of the word "investor" by Spectrum in the assignment agreements which it prepared for Commonwealth's approval is not a talisman which automatically brings this transaction within the ambit of the securities laws. *See United Housing Foundation v. Forman,* 421 U.S. 837, 848, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975) (use of the word "stock"

in a transaction does not automatically subject it to the securities laws). Instead, we will focus upon the realities of this transaction to determine the legal consequences. *Id.*

In defining the concept of "pooling" the Court in *Salcer, supra,* relied upon the earlier district court case of *Wasnowic v. Chicago Board of Trade,* 352 F.Supp. 1066 (M.D.Pa.1972) (Nealon, J.), *aff'd without opinion,* 491 F.2d 752 (3d Cir.1973), *cert. denied,* 416 U.S. 994, 94 S.Ct. 2407, 40 L.Ed.2d 773 (1974). In *Wasnowic,* the Court held that a discretionary trading agreement in commodities futures does not meet the definition of a security even though a broker commingled his customers' funds because the broker's actions constituted unilateral fraud and were not part of the original understanding. *Id.* at 1070. The Court noted that the original agreement of the parties did not call for the broker to commingle funds into "one big pot" and did not stipulate that each investor would share proportionately in the profits from the common fund. *Id.* at 1071. Thus, although the broker may have committed fraud or breached his contract by commingling funds from the various investors, the Court concluded that such conduct was not a violation of the securities laws.

Although *Wasnowic* involved a discretionary trading agreement in commodities futures, we think that its reasoning applies equally to the assignment of a right to receive a stream of lease payments as occurred in the case before us. Commonwealth and Spectrum entered into three separate assignment contracts, each virtually identical in its terms to the others, and each granting Commonwealth the right to receive lease payments, through an escrow agent, with the payments coming exclusively from Spectrum's lease contract with the GAO. (Spectrum Exhibits 1, Tab 1; 2; and 3). Commonwealth had no right to receive payments from any of Spectrum's other Government contracts, nor did any other "investor" have a right to receive lease payments from the Spectrum–GAO contract. Commonwealth attempts to finess this point in its brief in opposition to Spectrum's motion for summary judgment by arguing that:

> Each investors' ability to receive the monthly lease payments, as set forth in the investment contracts, was dependent upon Spectrum Leasing's performance of the lease contract with the Government agency.

(Commonwealth Brief in Opposition at 7). Although this argument may be accurate it is also unconvincing because each of Spectrum's contracts with the various Government agencies was independent of all of its other contracts. This means that if Spectrum were to default on its contract with the CIA, for example, its contract with the GAO would be unaffected and, correspondingly, although the "investor" that was entitled to receive payments on the one contract might not be paid, the "investor" on the other contract would be paid. Accordingly, even accepting Commonwealth's allegations of fact as true, its complaint fails to allege a common venture because it fails to show that each "investor" would share proportionately in the profits from a common fund. The undisputed facts show that Commonwealth's exclusive right to payments derived from the three Spectrum–GAO contract and from no other source.

Moreover, the mere fact that Spectrum may have commingled funds from various other parties who advanced monies for other leases into a single account does not alter our conclusion. The key requirement of pooling is that investors share proportionately in Spectrum's profits from its other Government leasing agreements. Although it may arguably have been improper for Spectrum to commingle funds from various sources into a single operating account, that commingling alone does not convert this transaction into an investment contract.

Commonwealth seeks to avoid this legal conclusion by citing the memorandum opinion of *Morgan v. Staats,* No. 84–2765, 1988 WL 22995 (W.D.Pa. Jan. 22, 1988) (LEXIS, Genfed Library, Dist. file). In that case investors in a coal brokerage contract brought a securities fraud action against

the promoters. The plaintiffs each provided funds in exchange for a promise of a fixed commission each year from the deal. The documents were structured as an assignment of brokerage interests and each plaintiff was classified as a co-broker, although only the assignor was required to service the contracts.

The Court in *Morgan* declined to apply *Salcer, supra,* to dismiss the suit for failure to allege a pooling of funds, noting instead that the Supreme Court has never defined "common enterprise." The Court went on to observe that "pooling" probably did not exist in that case but the Court's determination did not turn upon that fact alone. Rather, the Court concluded that the plaintiffs were tantamount to limited partners in a coal brokerage venture and declined to analyze the case as if it were a commodity trading account as was the case in *Salcer.*

We consider *Morgan* to be inapplicable to the case before us for two reasons. First, *Morgan* involved a limited partnership. There is nothing in the case before us which indicates that Commonwealth purchased a limited partnership interest in Spectrum, nor do we see any facts in the record which compel us to analyze this case as though it were a limited partnership.

Second, the facts of *Morgan* indicate that the plaintiffs were promised "an income stream from an exclusive coal brokerage contract," but no coal supply contracts were ever signed. These facts distinguish *Morgan* from the case before us. Unlike the Plaintiffs in *Morgan,* Commonwealth was not promised an income stream from a non-existent contract and was not a limited partner; rather, it was assigned the right to payments from an existing contract. Further, unlike the Plaintiffs in *Morgan,* Commonwealth was assigned security interests in Spectrum's contract with the GAO, in its equipment which it leased to the GAO, and in certain policies insuring against cancellation of the contract.

Commonwealth has also argued that Spectrum cannot avoid the effect of the securities laws by structuring its transactions as individually packaged lease agreements. In making this argument Commonwealth relies upon the case of *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

The scheme in *Howey* involved the sale of small lots of fruit trees with the offeror, the Howey Co., also offering a management contract by which an affiliate, Howey-in-the-Hills, Inc., would maintain the lots, pick the fruit, and market it, the profits inuring to the investors. *SEC v. W.J. Howey Co.,* 328 U.S. 293, 295, 66 S.Ct. 1100, 1101, 90 L.Ed. 1244 (1946). The tracts of land sold to investors were as small as 0.65 acre—often constituting a single row of trees—were indistinguishable from one another and were not separated by a fence, or by any other means. *Id.* All of the individual tracts of land were maintained by Howey-in-the-Hills as though they constituted a single orange grove: The company picked all of the fruit and pooled it together for market, the individual owners receiving an allocation of net profits based upon the quantities of fruit picked. *Id.* at 296, 66 S.Ct. at 1101. The individual owners had no right to specific fruit picked. *Id.*

Commonwealth's reliance upon *Howey* is procrustean at best. The scheme in *Howey* involved a single operation and, even though the individual investors purchased discrete interests, the nature of the enterprise was such that the fortunes of each investor necessarily would rise and fall with the fortunes of every other investor. It was not a realistic expectation of any investor that, for example, Howey-in-the-Hills would choose to harvest oranges from one investor's 0.65 acre tract, but leave another investor's adjacent 0.7 acre tract untouched, thereby breaching some of its contracts and not others. In addition, Howey-in-the-Hills combined all of the fruit for marketing and then paid the individual investors out of the profits from that pool. No pooling of investment profits is present in the case before us.

Again reviewing the facts of the present case, Spectrum, as Commonwealth alleges, entered into 31 discrete contracts with various Government agencies. Each of those

contracts was completely independent of the others such that a default by Spectrum on any given contract would not necessarily affect the interest of any other "investor" in one of Spectrum's other contracts. Thus, unlike *Howey*, each "investor" in Spectrum's 31 Government contracts could realistically expect, as part of the risk, that Spectrum might default on a particular contract, but not necessarily on others. It was purely fortuitous, and not a necessary consequence, that Spectrum defaulted on all of its contracts at about the same time. Similarly, Spectrum's profits on any one contract were unrelated to its profits on other contracts and those profits were never pooled into a common fund with individual investors sharing proportionately in the profits. Contrary to Commonwealth's assertion, the facts of this case do not mirror the facts of *Howey* and we see no basis for concluding that the transaction before us was an investment contract.

Moreover, even if a transaction appears to satisfy the *Howey* definition of an investment contract, it still might not be a security if the economic realities indicate otherwise. *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) (shares of stock in a cooperative residential housing project held not to be a security when the economic reality indicated that the motive of investors was to purchase a primary residence, not an investment). Applying the economic realities test to this case requires us to ask whether the transaction between Commonwealth and Spectrum was an investment vehicle which triggers the securities laws or whether it is more properly characterized as a commercial venture. *See Meason v. Bank of Miami*, 652 F.2d 542 (5th Cir. 1981) (requiring an inquiry into the economic realities using a commercial/investment dichotomy); *Union Planters National Bank of Memphis v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174 (6th Cir.1981) (loan participation agreement was not a security and the securities laws are not a "penacea for commercial loans gone awry"); *C.N.S. Enterprises, Inc.*, 508 F.2d 1354 (7th Cir.) (bank loans held not to be securities), *cert. denied*, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *Exchange National Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126 (2d Cir.1976) (mere involvement of a bank does not mandate a finding of no security based upon the commercial/investment dichotomy).

When notes or loan agreements have investment attributes some courts have found a security to exist. *McGill v. American Land & Exploration Co.*, 776 F.2d 923, 925 (10th Cir.1985) (note issued in connection with a joint venture held to be a security); *Underhill v. Royal*, 769 F.2d 1426 (9th Cir.1985) (notes for a "loan agreement program" maturing in three years held to be securities); *Shults v. Henderson*, 625 F.Supp. 1419 (W.D.N.Y. 1986) (10-year notes secured by real property and a chattel mortgage held to be subject to the securities laws). The definition of a security has been found not to be satisfied, however, when the loan agreement is purely commercial with a relatively short term, a rate of interest comparable to the applicable prevailing commercial rate, and which does not vary with the profitability of the borrower. *Union National Bank of Little Rock v. Farmers Bank*, 786 F.2d 881 (8th Cir.1986) (bank's purchase of a 100% interest in an unsecured note was not a security); *Kansas State Bank v. Citizens Bank*, 737 F.2d 1490 (8th Cir.1984) (bank's participation in a loan agreement providing secured financing for a corporate borrower held not to be a security); *Moy v. Warren*, [1984 Transfer Binder] Fed.Sec.L. Rep. (C.C.H.) ¶ 91, 601, 1984 WL 2453 (D.Or.1984) (a fixed rate loan secured by an interest in land was not a security because there was no reliance on the enterprise skills of the borrower and the only anticipated profit was the repayment of the principal plus interest).

In the case before us Spectrum entered into three separate assignments of lease payments with Commonwealth in exchange for which Commonwealth provided Spectrum with funds. The first assignment is dated November 30, 1984, with Commonwealth providing $418,68.52 to Spectrum in exchange for the right to receive 36 monthly payments of $14,370.98. Spectrum ar-

gues that the total of these monthly payments corresponds to an obligation on its part to repay the principal plus 14%. Commonwealth does not refute this argument, but asserts that a fixed rate of return does not preclude a finding that it was entitled to "profits." We are concerned with how the difference between the return and the money advanced compares with the prevailing commercial rate of interest on November 30, 1984, and whether the rate would vary with Spectrum's profitability on the particular transaction. Our concerns are the same for the other two Spectrum–Commonwealth assignments dated December 28, 1984, and March 1, 1985.

The parties do not dispute that Spectrum's obligation to repay Commonwealth was fixed and did not vary with Spectrum's profitability. The parties have not, however, supplied us with any documentation concerning the prevailing commercial loan rate between December 28, 1984, and March 1, 1985. The prime rate as published in the *Wall Street Journal* on January 2, 1985, was 10¾%. *See* Addendum to Civil Procedure Rule 238 Explanatory Comment, *reprinted in* Pennsylvania Reporter, 550 A.2d–551 A.2d at LXV (1989). Commonwealth has presented no evidence that a loan rate of 14% was not comparable to its standard commercial loan rate at the time. In addition, Spectrum's obligation to repay Commonwealth was tied to a fixed period of 36 months and the assignment agreements provide that Commonwealth's only recourse in the event of default is to proceed against the collateral provided by Spectrum as security. All of these facts lead us to conclude that the economic realities of this transaction do not support a conclusion that a security was involved.

### IV. *Conclusion.*

Construing the allegations of its second amended complaint in the light most favorable to Commonwealth, we conclude that there are no genuine issues of fact in dispute sufficient to warrant a trial on the merits of Counts I and II. Commonwealth has failed to demonstrate the existence of a "common venture" in this case and has therefore failed to state a claim for viola-

tion of the securities laws. In addition, the economic realities of the transactions between Spectrum and Commonwealth indicate that something other than a security was involved. We will therefore grant Spectrum's motion for summary judgment on Counts I and II of Commonwealth's second amended complaint.

An appropriate order will follow.