JOSEPH GIAMMANCO, Plaintiff-Appellant, v. PETER GIAMMANCO, JR., *et al.*, Defendants-Appellees.

Second District No. 2—93—0205

Opinion filed December 20, 1993.—Rehearing denied January 20, 1994.

Thomas J. Litwiler, of Oppenheimer, Wolff & Donnelly, and Russell M. Pelton, of Peterson, Ross, Schloerb & Seidel, both of Chicago (David C. Bohrer, of counsel), for appellant.

James W. Naisbitt, of Chuhak & Tecson, P.C., of Chicago (Cary S. Fleischer, of counsel), for appellees.

JUSTICE QUETSCH delivered the opinion of the court:

Plaintiff, Joseph Giammanco (Joseph), appeals from an order of the circuit court of Du Page County dismissing his amended complaint against defendants, Peter Giammanco, Jr. (Peter), Central Can Company, Red Oak Investment Corporation (Red Oak), and Wallace C. Wilsey, pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1992)) for failure to state a cause of action. On appeal, Joseph contends that the trial court erred in concluding that Joseph failed to plead "damages" sufficiently.

The allegations of Joseph's amended complaint are as follows. On December 14, 1989, Central Can Company, an Iowa corporation (Old Central Can), merged into CCC Acquisition Corp. (CCC), which was

thereafter renamed Central Can Company (New Central Can). CCC was formed by the shareholders of Red Oak for the purpose of acquiring Old Central Can. Joseph and Peter are brothers, and prior to the merger, each owned 50% of the stock of Old Central Can. Joseph and Peter were both officers of the company and until March 1989 were the only members of its board of directors. For several years prior to the merger, the brothers' personal and business relations had been deteriorating due to fundamental differences regarding the management and operation of the business. During 1988, the brothers explored possible options for terminating their business relationship, but could not reach an agreement. Peter had offered to purchase Joseph's interest in the company, but Joseph rejected the offer. Peter, in turn, had rejected Joseph's proposal that they divide ownership of the company's separate divisions.

Mark Crane served as counsel to Old Central Can and was apparently the trustee of a voting trust pursuant to which he was empowered to break deadlocks in shareholder votes. In March 1989, Crane suggested that the only viable resolution of the difficulties between Joseph and Peter was to sell the company to a separate and independent third party. Crane was installed as a third director of Old Central Can, with the understanding that if in his efforts to arrange for the sale of the company he was opposed by both Joseph and Peter, he would resign as a director and as trustee of the voting trust. Subsequently, in accordance with Crane's proposal, the firm of Bear, Stearns & Company, Inc. (Bear Stearns), was retained to explore options for the sale of Old Central Can and to solicit and investigate bidders for the company. Joseph and Peter agreed that neither would participate, directly or indirectly, in the bidding for the company. Ultimately, Red Oak emerged as the highest bidder for the Company, and on November 2, 1989, a meeting of the board of directors of Old Central Can was held during which Bear Stearns was given authorization to proceed with the negotiation of a definitive agreement for the sale of the stock of Old Central Can to Red Oak.

Red Oak's offer was structured as a proposal for a merger between CCC and Old Central Can, following which CCC would be the surviving corporation and Peter and Joseph would receive a total of $45 million for the stock of Old Central Can ($22.5 million for each brother's shares). Red Oak's offer exceeded the next highest bid by approximately $5 million. The offer was conditioned upon the brothers' agreeing to pay certain post-closing adjustments based upon the level of working capital on the closing date of the sale of the company. In addition, the terms of Red Oak's bid required Joseph and Peter,

severally, to indemnify the company up to an aggregate amount of $2.5 million for liability and litigation expenses in connection with certain antitrust proceedings. Following the board of directors meeting on November 2, Peter offered to purchase Joseph's stock directly for $24.5 million dollars. Peter's offer did not entail any post-closing adjustments or indemnification obligations. Joseph rejected the offer, allegedly because (1) he continued to feel strongly that he did not want to sell his stock to Peter; (2) he was concerned that, unlike Red Oak, Peter did not have adequate financing available; (3) if Peter could not complete the transaction it was unlikely that the company could still be sold for an amount as high as Red Oak had offered; and (4) he feared that Mark Crane would resign from his positions as director and voting trustee, exacerbating the problems between Joseph and Peter.

On November 8, 1989, another meeting of Old Central Can's board of directors was held. At the meeting, Peter's counsel stated that Peter intended to vote in favor of the merger with CCC, but that he also intended to negotiate an employment package with the company, and hoped to obtain a significant equity interest. Peter's counsel further indicated that Peter's previous offer to purchase Joseph's stock was still open. Mark Crane stated that it was his understanding that after the merger 15% to 25% of the stock in New Central Can would be offered to management, including 10% to 15% to the chief executive officer. Joseph indicated that he would vote to approve the merger based on the assumption that there was no "pre-arranged deal" between Peter and Red Oak.

Subsequent to the merger, Joseph allegedly discovered that contemporaneously with the merger Peter acquired a 96% interest in New Central Can, and on May 24, 1990, New Central Can redeemed Red Oak's remaining 4% of the stock for $1.6 million. Joseph alleged that Peter, Red Oak and defendant Wilsey (a principal shareholder of Red Oak) intentionally misrepresented or concealed material facts as part of a scheme devised to give Peter control of Old Central Can.

Joseph's four-count amended complaint sought recovery under theories of fraud (count I), breach of fiduciary duty (count II), promissory estoppel (count III) and breach of the implied duty of fair dealing and good faith (count IV). Defendants filed a motion to dismiss the amended complaint with prejudice. The trial court granted the motion. On appeal, Joseph contends that the dismissal of counts I, II and III was improper. Joseph does not challenge the dismissal of count IV.

Initially, we consider the question of appellate jurisdiction. Defendants have filed a motion to dismiss this appeal, which we have

taken with the case, contending that an oral motion by Joseph subsequent to the date of his notice of appeal rendered the notice of appeal ineffective. The trial court entered its order dismissing the case on February 9, 1993. On February 17, 1993, Joseph first filed his notice of appeal and then filed a written motion to stay enforcement of the trial court's judgment pending appeal. The motion for a stay was heard on February 24, 1993. During the hearing, Joseph's attorney elaborated on the circumstances underlying the request for a stay. Joseph's attorney stated that, after the trial court entered its dismissal order, counsel for New Central Can indicated that the company would take affirmative action to enforce Joseph's indemnification obligation. If New Central Can brought an action against him, Joseph intended to interpose the defense of fraud in the inducement. Joseph was concerned, however, that if he did so, New Central Can might claim that under the doctrine of *res judicata* the dismissal of Joseph's lawsuit with prejudice barred Joseph from asserting this defense. The trial court determined that this was an improper basis for a stay of the order of dismissal. During the hearing, Joseph's attorney apparently concluded that this concern about the consequences of the dismissal order might be ungrounded if the basis of the order was simply the failure to allege damages properly. The trial court stated as follows:

"THE COURT: We had a lengthy discussion off the record on this motion for stay pending appeal.

The motion as presented for stay pending appeal is denied.

However, there has been an oral motion for a clarification of this Court's granting of the 2–615 motion to dismiss the four counts.

The sole basis for the dismissal of those four counts was that this court dismissed all four counts for failure to state a cause of action based on the fact—and this is more detailed in the record of the decision—but based on the fact that this court did not find any recognizable damage theory in that the damages were too speculative.

However, this Court did not rule in that motion to dismiss on the merits of any of the causes of action or any of the alleged facts presented in those particular causes of action.

\* \* \*

\*\*\* [E]ven looking upon those allegations as true, the Court found that the causes of action were not stated because of the lack of damages in each and every count."

Following the hearing, a written order was entered providing, in pertinent part, "[o]n plaintiff's oral Motion for Clarification, the Court's order of [February 9, 1993,] is clarified as per transcript."

■■ Supreme Court Rule 303(a)(2) provides, in pertinent part:

"When a timely post-trial motion has been filed by any party *** a notice of appeal filed before the entry of the order disposing of the last pending post-trial motion shall have no effect and shall be withdrawn by the party who filed it, by moving for dismissal pursuant to Rule 309. This is so whether the timely post-trial motion was filed before or after the date on which the notice of appeal was filed. A new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the post-trial motion, as provided in subparagraph (a)(1) of this rule." 134 Ill. 2d R. 303(a)(2).

Although the original written motion for a stay pending appeal is not a post-trial motion within the meaning of Rule 303(a)(2) (see, *e.g., In re Estate of Goodlett* (1992), 225 Ill. App. 3d 581, 586-87; *In re Petition of Village of Kildeer to Annex Certain Property* (1987), 162 Ill. App. 3d 262, 280, *aff'd* (1988), 124 Ill. 2d 533), defendants contend that the oral motion for clarification is such a motion. We disagree.

A "post-trial motion" for purposes of Rule 303(a)(2) must be one which specifically requests one or more of the statutorily authorized types of relief consisting of rehearing, retrial, modification or vacation of the judgment. (*Marsh v. Evangelical Covenant Church* (1990), 138 Ill. 2d 458, 461; *In re Estate of Goodlett* (1992), 225 Ill. App. 3d 581, 586.) Moreover, even where a motion seeks to modify the judgment, it does not constitute a post-trial motion within the meaning of Rule 303(a)(2), unless it is "directed against the judgment." *Marsh*, 138 Ill. 2d at 462 (even if section 2—611 motion for attorney fees was construed as a motion to modify the judgment, it was not "directed against the judgment").

■■ The judgment in the case at bar was a judgment of dismissal with prejudice for failure to state a cause of action. At no point did Joseph in any way challenge this judgment in the trial court. Joseph simply sought to have the trial court reiterate the explanation it had previously given on February 9. Moreover it does not appear that Joseph actually sought clarification of the trial court's reasoning, in the sense that there was any lack of clarity in the trial court's statement of its reasoning during the hearing on February 9. Rather, it appears that Joseph's attorney primarily wanted to confirm his understanding of the trial court's reasoning.

In *Lewis v. Loyola University* (1986), 149 Ill. App. 3d 88, cited by Joseph, the defendants appealed from a judgment favorable to the plaintiff. The plaintiff thereafter filed a motion for findings of fact and conclusions of law. The motion specifically stated that the plaintiff "accepts the judgment *** and is willing to abide by the terms and conditions of the judgment order." (149 Ill. App. 3d at 92.) The court held that the motion was not directed against the judgment as contemplated by Rule 303(a)(2). We reach the same conclusion in the case at bar.

We are aware that in *Knapp v. City of Decatur* (1987), 160 Ill. App. 3d 498, 503, a "motion for findings" by a plaintiff whose complaint had been dismissed was considered to be "sufficiently directed against the *** judgment to constitute a post-trial motion under section 2—1203," where the motion "did not expressly accept the court's judgment as in *Lewis.*" *Knapp* is factually distinguishable. In that case, the "findings" related to the nature of the relief granted to the defendants on their motions to dismiss. The plaintiff sought "findings" regarding "(1) whether the plaintiff's motion for leave to file an amended complaint was granted; (2) whether plaintiffs' first-amended complaint was filed; (3) whether the complaint or amended complaint was dismissed; and (4) whether the cause was dismissed with or without prejudice." (160 Ill. App. 3d at 501.) The court viewed the motion as requesting, "in effect, a change in the form of the original judgment to reflect the actual action taken." There is no similar confusion in the case at bar about what action was taken by the trial court. Moreover, we think it is abundantly clear from statements of Joseph's attorney during the hearing on February 24, 1993, that, like the prevailing plaintiff in *Lewis*, he had no intention of challenging the judgment of dismissal in the trial court. We think *Lewis* rather than *Knapp* is more closely analogous to the case at bar.

The cases cited by defendants in support of their view that jurisdiction is lacking are inapposite. Defendants note that in *In re Application of County Treasurer* (1990), 208 Ill. App. 3d 561, and *Woodard v. Krans* (1992), 234 Ill. App. 3d 690, motions denominated as motions to "clarify *and reconsider*" (emphasis added) were considered post-trial motions. Reconsideration is one of the statutorily authorized forms of relief. Here, however, in no sense was reconsideration sought. Defendants also cite *People v. Paliemar* (1985), 132 Ill. App. 3d 830, where the court referred to a "motion to clarify" as a post-trial motion. In *Paliemar*, whether the motion was a post-trial motion directed against the judgment within the meaning of Rule 303(a)(2) was of no consequence to the jurisdictional question because the mo-

tion was not filed within 30 days after the judgment was entered, and the appellate court would have lost jurisdiction regardless of the character of the motion.

We conclude that our jurisdiction is proper, and defendants' motion is therefore denied.

We turn now to the merits of the case. With respect to counts I (fraud), II (breach of fiduciary duty) and III (promissory estoppel) of Joseph's amended complaint, defendants asserted in their motion to dismiss that "there is no proximate cause between the damages alleged and the wrongful acts stated within said Count. The damages are speculative and not legally cognizable." In dismissing the amended complaint for failure to state a cause of action, the trial court found:

> "In the case at bar, it is necessary to speculate as to the fact of damage. Even accepting all well-pleaded facts as true, it cannot be said with any reasonable degree of certainty that the plaintiff has been damaged.
>
> The fact that any damage to plaintiff is uncertain disallows any recovery in this case."

In ruling on a motion to dismiss pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1992)), the court must accept as true all well-pleaded facts and all reasonable inferences which can be drawn therefrom. (*Kolegas v. Heftel Broadcasting Corp.* (1992), 154 Ill. 2d 1, 8-9; *Johnson v. George J. Ball, Inc.* (1993), 248 Ill. App. 3d 859, 863.) The court should not dismiss a complaint for failure to state a cause of action unless it clearly appears that no set of facts could be proved which would entitle the party to relief. (*Johnson*, 248 Ill. App. 3d at 863.) In making this determination, the court is to interpret the allegations of the complaint in the light most favorable to the plaintiff. (*Kolegas*, 154 Ill. 2d at 9; *Johnson*, 248 Ill. App. 3d at 863.) The complaint must be liberally construed with a view to doing substantial justice between the parties. 735 ILCS 5/2—603(c) (West 1992); *Johnson*, 248 Ill. App. 3d at 864.

■ We first consider whether the trial court properly dismissed Joseph's claim for fraudulent misrepresentation. The elements of the tort of fraudulent misrepresentation are: (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in justifiable reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance. (*Gerill Corp. v. Jack L. Hargrove Builders, Inc.* (1989), 128 Ill. 2d 179, 193; see also *Johnson v. George J. Ball, Inc.* (1993), 248 Ill. App. 3d 859, 867.)

Defendants have not challenged the sufficiency of Joseph's allegations with respect to the first four elements of the cause of action. The sole issue is whether the damage element was sufficiently pleaded. Referring to the established measures of damages in fraud actions, defendants maintain that Joseph did not suffer any "legally cognizable damages." Defendants also argue that their alleged misconduct was not the proximate cause of "damages" to Joseph.

At this point we believe clarification of the pertinent terminology may be helpful. "Damage" (an element of the tort of common-law fraud) is to be distinguished from "damages" (a remedy). It has been noted that, "[a]lthough the words, 'damage,' 'damages,' and 'injury,' are sometimes treated loosely as synonyms, there is a material distinction between them. Injury is the illegal invasion of a legal right; damage is the loss, hurt, or harm which results from the injury; and damages are the recompense or compensation awarded for the damage suffered." (Ballentine's Law Dictionary 303 (3d ed. 1969); see also Black's Law Dictionary 351 (5th ed. 1979) ("The word ['damage'] is to be distinguished from its plural, 'damages', which means a compensation in money for a loss or damage").) In determining whether Joseph's allegations were sufficient to survive a motion to dismiss for failure to state a cause of action, the correct inquiry is whether damage has been alleged. It is likewise true that damages must be proved to be recovered. (*Poeta v. Sheridan Point Shopping Plaza Partnership* (1990), 195 Ill. App. 3d 852, 858.) If a party proves the right to damages but fails to provide a proper basis for computing those damages, only nominal damages can be recovered. (*Keno & Sons Construction Co. v. La Salle National Bank* (1991), 214 Ill. App. 3d 310, 312.) However, liability for nominal damages is sufficient to sustain a cause of action. *In re Application of Busse* (1984), 124 Ill. App. 3d 433, 439.

▪ As the parties have premised their arguments primarily on the question of how damages should be calculated in this case, we briefly review the applicable principles, mindful that our inquiry is whether damage to Joseph has been sufficiently alleged. Generally, in the United States two approaches to the measure of damages in fraud actions have developed: the "benefit of the bargain" approach and the "out of pocket loss" approach. (See generally W. Prosser, Torts §110, at 733-34 (4th ed. 1971); Annot., 13 A.L.R.3d 875 (1967).) Under the out-of-pocket rule, followed in a minority of jurisdictions, damages awarded represent "the difference between the value of what [the defrauded party] has parted with and the value of what he has received. If what he received was worth what he paid for it, he has not been

damaged, and there can be no recovery." (W. Prosser, Torts §110, at 734 (4th ed. 1971).) Decisions in Illinois have generally followed the benefit-of-the-bargain approach. (See *Gerill Corp.*, 128 Ill. 2d at 196; *Poeta*, 195 Ill. App. 3d at 858.) Under this approach, "damages are determined by assessing the difference between the actual value of the property sold and the value the property would have had if the representations had been true." *Gerill Corp.*, 128 Ill. 2d at 196.

The benefit-of-the-bargain rule best fits the most common fraud scenario where a buyer (or sometimes a lessee) has been misled about the quality of property or some other matter relevant to a pecuniary aspect of the transaction. Thus this court has stated, "[i]n an action for fraudulent misrepresentations in the sale of property, the measure of damages is the difference between the value of the property as it is and what it would have been worth if the representations had been true. [Citations.] Therefore, to show injury, plaintiffs must allege facts which show the value of what they received was not equal to the value of what they were promised." *Sommer v. United Savings Life Insurance Co.* (1984), 128 Ill. App. 3d 808, 816 (actual death benefit under life insurance policy was approximately half the amount that defendant's agents had represented would correspond to a particular schedule of premium payments and loans against the policy; plaintiffs would have to pay far higher premiums to receive death benefit represented); see also *Four "S" Alliance, Inc. v. American National Bank & Trust Co.* (1982), 104 Ill. App. 3d 636 (lessee of gas station under month-to-month tenancy awarded the profit difference for the gas actually sold during months before misrepresentation had been corrected, and the volume of sales that had been represented orally); *Munjal v. Baird & Warner, Inc.* (1985), 138 Ill. App. 3d 172, 186-87 ("In Illinois, a purchaser of property who has established fraud is entitled to damages which will give him 'the benefit of [his] bargain.' [Citation.] *** [O]ne method of calculating damages in cases of fraudulent misrepresentation or concealment is the difference between the value that the property would have had at the time of sale if the defects did not exist and the value the property actually had at the time of the sale due to the defects"); *Posner v. Davis* (1979), 76 Ill. App. 3d 638, 644-45 (same); *In re Application of Busse* (1984), 124 Ill. App. 3d 433, 442-43 (where promissory note, which defendants substituted for note specified in contract, provided for installment payments at later dates than note specified in contract, plaintiffs were deprived of the "benefit-of-their-bargain" since "[t]he postponement of payment dates clearly deprived the plaintiffs of the use of the monies which defendants were obligated to pay and which plaintiffs were legally en-

titled to receive. The deprivation of the payment and the use of the monies constituted a wrong and an injury to the damage of the plaintiffs").

It has been recognized, however, that a benefit-of-the-bargain measure may not be appropriate in all circumstances. For instance, the Restatement (Second) of Torts refers to the situation where a defrauded seller sells property for less than its value in reliance on the buyer's representation that the property is practically worthless. In that case "[o]n the basis of the representations, taken to be true, the seller would have sold worthless property for a substantial price and suffered no loss at all," and, according to the Restatement, the defrauded seller may therefore recover out-of-pocket losses. (Restatement (Second) of Torts §549, Comment *g*, at 115 (1977).) In *Gold v. Dubish* (1989), 193 Ill. App. 3d 339, it was held that lost profits under a benefit-of-the-bargain analysis were improper where the defrauded parties had not actually consummated the purchase of the defendants' business. The court held, however, that "out-of-pocket" damages based on lost wages and benefits, and expenses incurred by the plaintiffs in securing new employment, could be awarded where the plaintiffs had detrimentally relied on the defendants' assurances that the sale would be consummated by leaving their existing employment. 193 Ill. App. 3d at 351-52.

With these principles in mind we consider the parties' arguments regarding the calculation of damages in the case at bar. Joseph advances two theories for computing his damages. Under both theories, the damages equal the difference between the price offered by Peter to purchase Joseph's stock and the price paid by Red Oak (adjusted to account for Joseph's post-closing obligations). Joseph's first theory is that "but for the fraud" he would have accepted Peter's higher offer. In support of the proposition that there exists a recognized "but for" measure of damages distinct from other recognized measures (*e.g.*, "benefit of the bargain" or "out-of-pocket loss"), Joseph cites *Beaton & Associates, Ltd. v. Joslyn Manufacturing & Supply Co.* (1987), 159 Ill. App. 3d 834. In *Beaton* the court stated that "[o]ne induced to contract through the fraud of another may elect to rescind the contract and recover the consideration paid, or *affirm the contract* and recover the difference between the property received and what he or she would have received but for the fraud." (Emphasis added.) (159 Ill. App. 3d at 844.) Contrary to Joseph's argument, this language simply describes the established benefit-of-the-bargain measure. In *Beaton* a former officer and director of a corporation was engaged by the corporation as its agent to arrange security services for the corpo-

ration's manufacturing facilities. Unbeknownst to the corporation, the agent was receiving a commission from the firm selected to provide the security services. The court held that the payments to the agent represented the difference between the value of the security services received, including the agent's misconduct in obtaining those services, and what the corporation would have received but for the fraud.

■ In any event, we think Joseph's analysis is incorrect for a more fundamental reason. Joseph's theory does not portray what would have occurred "but for the fraud." Instead, the outcome Joseph suggests is dependent on defendants' having attempted to perpetrate fraud, but Joseph's having known the true facts. The unusual aspect of this case is that Peter allegedly engaged in a fraudulent scheme to overcome Joseph's resistance, even though an honest transaction (the direct purchase of Joseph's stock) allegedly might have been more advantageous to Peter from a tax standpoint. As alleged, Peter, in pursuit of the ultimate objective of gaining control of Old Central Can, hedged an honest advantageous offer with a less advantageous dishonest offer. If Peter had been completely forthright in his dealings he would not have been forced essentially to bid against himself in this manner. There is no realistic basis to conclude that the higher offer would necessarily have been made in such circumstances. The result Joseph seeks is not that which would have occurred "but for the fraud"; rather, it is the result that would have ensued if Joseph had been able to exploit the fraudulent scheme to his own advantage. There might have been some irony in such a result if Joseph had been able turn the tables on the allegedly fraudulent parties. However, that did not happen. It is the function of this court to administer justice, not poetic justice, and the measure plaintiff proposes is not compensation for an actual loss.

Joseph also maintains that, under the benefit-of-the-bargain rule, he is entitled to damages equal to the difference between the price offered by Peter and the adjusted price paid by Red Oak. Joseph contends that he bargained for the sale of Old Central Can to an independent purchaser and that price difference represents the value *to him* of that aspect of the bargain. Defendants argue, on the other hand, that there were no misrepresentations bearing on the value of any property in the transaction; Joseph received exactly what he was promised and cannot be awarded damages under a benefit-of-the-bargain theory.

Although a variety of torts can theoretically be accomplished through the use of deception, the tort of common-law fraud is primarily addressed to the invasion of economic interests. (See D. Dobbs,

Remedies §9.1, at 591 (1973).) "[D]eceit belongs to that class of tort of which pecuniary loss generally constitutes part of the cause of action." (37 Am. Jur. 2d *Fraud & Deceit* §283, at 378 (1968).) It has also been stated that "the loss or injury need not be of a specifically pecuniary character. It is sufficient if the fraud has resulted in a right which the law recognizes as of pecuniary value." (37 Am. Jur. 2d *Fraud & Deceit* §292, at 388 (1968).) However, "[i]f the plaintiff is not materially harmed by the defendant's conduct, however flagrant it may have been, there may be no recovery." *Shults v. Henderson* (W.D.N.Y. 1986), 625 F. Supp. 1419, 1426 (although majority shareholder failed to disclose to minority shareholders that, in connection with a proposed sale of the corporation's assets, he had entered into a consulting agreement with the purchaser, the minority shareholders' reliance on this conduct "was in no way detrimental to their pecuniary interests" where consulting agreement was not a sham and was a condition to regulatory approval of transfer, and consideration for purchase of assets was greater than the minority shareholders' estimate of the value of the business).

We do not believe the benefit to Joseph of an independent purchaser is of a sufficient pecuniary character that deprivation of that benefit can be compensated in a fraud action under a benefit-of-the-bargain theory. Joseph may have sincerely placed a high value on preventing Peter from acquiring Old Central Can. However, Joseph's financial position is no different than it would have been if Red Oak had honored the bargain. A fraud action does not afford a remedy for harm to one's pride. *Cf. Walsh v. Ingersoll-Rand Co.* (8th Cir. 1981), 656 F.2d 367, 371 (humiliation, embarrassment and career disruption were equivalent to emotional harm and were not compensable in a fraud action).

If we were to focus solely on the completed bargain, we would therefore agree with defendants that no right to compensation (or at best only a right to nominal damages) has been alleged. However, under the unusual circumstances of this case, we believe such a focus is too narrow, and even though application of the benefit-of-the-bargain rule does not reveal pecuniary harm, we do not find this to be conclusive of whether such harm occurred. While from the standpoint of the *completed bargain* the independence of the buyer may not have value in a pecuniary sense, it seems quite clear that Joseph's insistence on an independent buyer had pecuniary value in the *bargaining process*. Defendants characterize Joseph's unwillingness to sell his stock to Peter as "noneconomic" behavior. We disagree. It has not been suggested that Joseph was not entitled to bargain with Peter on the basis

of the special value the brothers may have placed on control of the company. It may fairly be inferred that Joseph and Peter valued Old Central Can more highly than an independent purchaser might. Moreover, the brothers' understanding regarding the bidding process served to prevent either of them from exploiting a depressed price for the company that might result due to the "forced sale" circumstances under which they were disposing of the company. Peter's alleged scheme altered the fundamental assumptions underlying the bargaining process, and even though Joseph may not have been deceived with respect to pecuniary aspects of the ultimate bargain, we believe the distortion of the bargaining process is itself sufficient to establish damage. Accordingly, we conclude that under the unusual circumstances of this case, Joseph's right to bargain with whomever he desired, and to know with whom he was bargaining, is of a pecuniary character, and the deprivation of this right constitutes damage for which Joseph is entitled to seek compensation.

Generally, it has been stated that in a fraud action "[a] plaintiff may recover damages for any injury which is the direct and natural consequence of his acting on the faith of defendant's representations." (*Gold v. Dubish* (1989), 193 Ill. App. 3d 339, 351.) While the "benefit-of-the-bargain" or, in appropriate circumstances, "out-of-pocket" loss is the usual measure by which compensation is quantified, we do not believe they are in all cases a perfect litmus test for the existence of compensable damage. "General damages measures are only 'guides to common sense' to begin with." (D. Dobbs, Remedies §9.2, at 595 n.8 (1973).) These particular measures have been formed and forged in cases that did not involve the unusual circumstances of the case at bar, and we believe an excessively rigid adherence to these measures would be unjust here. Courts administering justice should not be outpaced by creative wrongdoers. Moreover, we are mindful of the fact that damages in fraud cases serve an admonitory function (see Restatement (Second) of Torts §549, Comment *i*, at 115 (1977)) which would be severely undermined if the harm which we have identified were held to be noncompensable as a matter of law. Such a holding would put those who conduct themselves honestly in such business dealings at a distinct disadvantage.

The most closely analogous case we are aware of, *Daniel Boone Complex, Inc. v. Furst* (1979), 43 N.C. App. 95, 258 S.E.2d 379, supports our view that Joseph's common-law fraud claim alleges compensable harm. *Furst* arose from a somewhat complicated series of transactions involving an amusement park complex and an understanding of the case requires that the facts be recited in some detail. The own-

ers of the amusement park complex entered into an agreement to sell the complex to Matthew and Genevieve Mezzanotte, who in turn assigned the sale agreement to Daniel Boone Complex, Inc. (Daniel Boone), a corporation wholly owned by the Mezzanottes. Thereafter, Camilco, Inc. (Camilco), purchased all of the stock in Daniel Boone from the Mezzanottes. As the date for closing on the sale of the amusement park approached, Daniel Boone lacked sufficient funds to complete the transaction. Camilco (Daniel Boone's parent company) contacted Mitchell Furst, who was acting as an agent for an undisclosed principal, seeking to obtain a loan, the proceeds of which would be used by Daniel Boone to purchase the amusement park. On behalf of his undisclosed principals, Furst agreed to loan Camilco $136,550.73 in exchange for a promissory note in the amount of $273,101.46 secured by, *inter alia*, a pledge of all the stock in Daniel Boone and a deed of trust to the amusement park complex (which would be subordinate to the purchase money deed of trust in favor of the sellers of the amusement park). Unbeknownst to Camilco, the Mezzanottes were Furst's undisclosed principals. Prior to the closing of the loan, Furst had intentionally denied that this was the case. Subsequently, actions for the foreclosure of both deeds of trust were instituted. In a partial settlement of ensuing litigation, the $273,101.46 promissory note was cancelled. In Camilco's fraud action, the trial court found that Camilco had not been damaged by Furst's misrepresentation regarding the identity of the lenders. The reviewing court reversed:

"The trial court found in its findings of fact that Furst had intentionally misrepresented the identity of his undisclosed principals, the Mezzanottes. In doing so, the trial court focused on the Mezzanottes' reasons for not having their identity revealed; however, the court's crucial inquiry, as trier of fact, should have focused on what significance Furst's misrepresentation of the identity had on Camilco's execution of the Furst-Camilco loan.

A contract can be avoided against one who through misrepresentation on his part or the part of his agent has become a party to it knowing that someone else was intended or knowing merely that he was not intended to be a party. [Citations.] The rule does not differ when the identity of a moneylender is the fact being misrepresented. [Citation.] Persons borrowing money may very well consider the identity of their lender. In the instant case, Camilco has presented evidence indicating that it would not have dealt with the Mezzanottes for various reasons.

We hold that the trial court erred in not making any determination of fact on the existence of this requisite element of fraud.

Respondents contend that, even if evidence of the first four elements of fraud exists, the trial court did not err in its determination of no fraud, because appellants suffered no damage. It is true that appellants do not presently have any liability on the original $273,101.46 promissory note. Should the court determine that the identity of the undisclosed lenders, the Mezzanottes, was essential to Camilco's execution of the loan and mortgage agreements, Camilco would be able to meet the requisite damage element of fraud. The execution of the loan and mortgage agreement with a party with whom it did not wish to deal would be sufficient injury." (43 N.C. App. at 103-04, 258 S.E.2d at 386.)

The court concluded that if the trial court were to determine that the misrepresentation induced the execution of the loan and mortgage agreements, "then Camilco would be entitled to recover any damages shown to result therefrom." 43 N.C. App. at 105, 258 S.E.2d at 387.

As a general rule, damages may not be predicated on mere speculation, hypothesis, conjecture or whim. (*De Koven Drug Co. v. First National Bank* (1975), 27 Ill. App. 3d 798, 802.) However, once the existence of damage has been established, evidence tending to reasonably approximate the extent of damage is admissible. (*De Koven*, 27 Ill. App. 3d at 802.) Absolute certainty as to the amount of damage in such cases is not required to justify a recovery; it is only necessary that the evidence tend to establish a basis for the assessment of damages with a fair degree of probability. (*De Koven*, 27 Ill. App. 3d at 802.) We believe the allegations of Joseph's amended complaint are sufficient with regard to the damage requirement of the tort of fraudulent misrepresentation and Joseph is entitled to attempt to establish a basis for assessment of damages. It is premature at the pleading stage to conclude damages are speculative, as defendant argues.

Our reasoning with regard to Joseph's fraud claim is largely dispositive of the issue of the sufficiency of Joseph's allegations of count II of the amended complaint seeking recovery for breach of fiduciary duty. Joseph's breach of fiduciary duty theory is premised on the principle that, as the sole and coequal shareholders of Old Central Can, Joseph and Peter owed each other a fiduciary duty similar to that of partners. (See *Illinois Rockford Corp. v. Kulp* (1968), 41 Ill. 2d 215; *Battaglia v. Battaglia* (1992), 231 Ill. App. 3d 607, 618; *Hagshenas v. Gaylord* (1990), 199 Ill. App. 3d 60, 71.) The parties appear to be in agreement that one claiming breach of fiduciary duty may seek recov-

ery based on a theory of unjust enrichment. (See *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.* (1985), 137 Ill. App. 3d 84, 91, *aff'd* (1986), 114 Ill. 2d 278 ("if defendants had unjustly enriched themselves by fraud or by a breach of a fiduciary relationship, the plaintiffs could seek redress by a constructive trust or other theory of action").) In our view, Joseph's allegations sufficiently identify an advantage to Peter arising from the distortion of the bargaining process which corresponds to the loss or harm to Joseph previously discussed. We recognize that recovery on this basis may likewise entail difficulty of quantification. Moreover, we express no opinion as to whether the value of the advantage is necessarily *equal* to loss or harm to Joseph or whether there may be potential offsetting factors which might be taken into account in determining an appropriate award under this theory.

Defendants argue that there was no gain to Peter. They contend that Peter was actually harmed, since, because Joseph refused to deal with him, Peter was forced to pay more for Old Central Can than the next highest bidder. However, at present there has been no suggestion that Joseph acted wrongfully in his negotiations with Peter or in seeking to hold Peter to their mutual agreement that neither brother would participate in the bidding process. That Peter might have been in a better position if Joseph had acted more generously toward him is of no consequence to the issue before us.

Defendants also suggest, without citation of authority, that because the prayer for relief in count II of the amended complaint sought damages for Joseph's loss, Joseph cannot seek recovery based on gain to Peter. We agree with Joseph that at most defendants have identified a technical defect in the pleadings for which dismissal with prejudice is inappropriate relief. (See 735 ILCS 5/2—604 (West 1992) ("Prayers for relief which the allegations of the pleadings do not sustain may be objected to on motion or in the answering pleading").) We therefore conclude that the trial court erred in dismissing count II of the amended complaint with prejudice.

Defendants have also argued that their alleged misconduct was not the proximate cause of any harm to Joseph. Defendants have failed to explain how the concept of proximate cause applies to the facts alleged. In fraudulent misrepresentation cases, "[s]o far as the fact of causation is concerned, any loss which follows upon a transaction into which the misstatement induces the plaintiff to enter may be said to be caused by it." (W. Prosser, Torts §110, at 732 (4th ed. 1971).) However, although a transaction may have been induced by a misrepresentation, the requirement of proximate cause limits recovery

to "those damages that which might foreseeably be expected to follow from the character of the misrepresentation itself." (W. Prosser, Torts §110, at 732 (4th ed. 1971).) To illustrate, "if false statements are made in connection with the sale of corporate stock, losses due to a subsequent decline of the market, or insolvency of the corporation, brought about by business conditions or other factors in no way related to representations, will not afford any basis for recovery." (W. Prosser, Torts §110, at 732 (4th ed. 1971).) We fail to see how this limitation would operate to defeat recovery in the case at bar.

We agree with defendants, however, that recovery in this case cannot be premised on a theory of promissory estoppel. "To establish a claim based on promissory estoppel, plaintiff must allege and prove that (1) defendants made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." (*Quake Construction, Inc. v. American Airlines, Inc.* (1990), 141 Ill. 2d 281, 309-10.) Joseph seeks to enforce alleged promises that Peter would not participate directly or indirectly in bidding for Old Central Can. Joseph contends that he relied on these promises to his detriment by rejecting Peter's offer to purchase his stock directly. Promissory estoppel is a doctrine under which a plaintiff may recover without the presence of a contract. (*Illinois Valley Asphalt, Inc. v. J.F. Edwards Construction Co.* (1980), 90 Ill. App. 3d 768, 770.) Joseph has cited no authority that one may achieve a greater recovery under a theory of promissory estoppel than he would have recovered had the promise been a contractual obligation supported by consideration. We have already concluded that, viewed from the standpoint of the completed bargain, Joseph would not be entitled to recovery under the benefit-of-the-bargain rule. The same conclusion applies to Joseph's claim based on the theory of promissory estoppel.

For the foregoing reasons, the judgment of the circuit court of Du Page county is affirmed with respect to the dismissal of counts III and IV of the amended complaint and reversed with respect to the dismissal of counts I and II of the amended complaint, and the cause is remanded.

Affirmed in part; reversed in part and remanded.

McLAREN and DOYLE, JJ., concur.