ESTATE OF WAYNE YOUNG *et al.*, Plaintiffs-Appellants, v. THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—99—2782

Opinion filed August 1, 2000.

Richard L. Manning, of Burman & Manning, of Chicago, for appellants.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Patrick W. Carlson, Assistant Attorney General, of counsel), for appellees.

PRESIDING JUSTICE COUSINS delivered the opinion of the court:

Wayne and Alan Young were president and vice-president, respectively, as well as the owners, of Power Lift, Inc. (Power Lift). The Illinois Department of Revenue (the Department) assessed a penalty against Wayne, Alan and another officer of Power Lift for wilfully failing to pay the corporation's obligations under the Retailers' Occupation Tax Act (ROT Act) (35 ILCS 120/1 *et seq.* (West 1996)). They challenged their personal liability, and a hearing was held before an administrative law judge (ALJ). Wayne died and his estate was substituted for him. The ALJ recommended that the Department uphold the penalties, and the Director accepted the recommendation.

Wayne's estate and Alan appealed to the circuit court under the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 1996)). The circuit court issued a memorandum ruling in favor of the Department. Wayne's estate and Alan then appealed to this court. They argue that the Department's finding that their failure to pay Power Lift's taxes was wilful was clearly erroneous. The Department, for its part, argues that we do not have jurisdiction to hear the appeal since the notice of appeal from the circuit court decision was filed before the final order.

## BACKGROUND

Wayne Young and his brother Alan organized Power Lift in the 1970s. Power Lift was in the business of selling, renting and servicing lifting equipment and aerial work platforms. Wayne was the president and owned 80% of the stock. Alan was the vice-president and owned 20% of the stock. They and Richard Feltz, Power Lift's general manager, were the directors of the corporation. Feltz was a childhood friend of Wayne's and had no formal training in financial matters. It was Feltz who oversaw the day-to-day operations of the company. In 1991, Power Lift had 86 employees and assets of $5,950,000. Wayne

drew a salary of over $185,000 per year. Alan drew a salary of over $95,000 per year. At that time Robert Hodgetts, a certified public accountant (CPA), was its comptroller. The building in which Power Lift operated was owned by JWA Properties (JWA), a partnership owned by the Youngs and their father. Power Lift paid JWA about $15,000 per month in rent.

In the course of its business, Power Lift collected tax monies, which it would put into its bank account before sending them to the Department. This was the same bank account from which it paid salaries and other corporate obligations. Approval from Wayne, Alan or Feltz was required to draw a check on this account.

According to the Youngs, Power Lift had a system in place for paying taxes, which operated as follows. Mary O'Malley, an employee at the Power Lift office, prepared the sales tax returns from the company's books and records. Then she would sign the returns as "preparer" and give them to Hodgetts. Hodgetts checked over the returns and, if they were correct, requested approval for a check to pay the tax due. After the check was drawn, Hodgetts gave the check and the return to Feltz, who would then sign for the taxpayer and send them to the Department. The payment of the tax would be recorded in Power Lift's books.

In the early 1980s the Youngs had trouble with a separate company they ran. The company underpaid federal withholding tax and the Internal Revenue Service (IRS) sought to impose personal liability on the Youngs. Because of this experience, the Youngs instituted a policy at Power Lift "to pay taxes first, insurance second, payroll third and then [its] vendors." Nevertheless, Power Lift filed each retailers occupational tax (ROT) return between July 1990 and most of 1991 late.

In 1991, Power Lift was having grave financial problems. The books did not balance in 1990 or 1991. Power Lift was on a cash-on-delivery basis with Nissan, its main supplier. A bank accelerated Power Lift's repayment for a line of credit. The company's bills were left unpaid for up to 120 days. Some vendors would only do business with Power Lift on a cash basis, and some refused to do any further business at all with the company. It incurred about $86,000 in unpaid federal withholding taxes which the Youngs paid personally. Power Lift faced a multimillion dollar tort liability from a fatal accident involving one of its vehicles. The claim exceeded the limits of the company's insurance policy. It was widely known within the company that Power Lift was having cash flow problems.

Alan admitted that Power Lift's accounting was "screwed up." The comptrollers that the Youngs had hired had not been able to clear up the bookkeeping problems. According to the service manager, there

was a "rotating door" for comptrollers. Although the books were supposed to reflect payment of taxes, Hodgetts conceded that this did not always happen. When he joined Power Lift in 1990 the books "didn't balance to a lot of things." He knew that the ledger system was "a mess." Accordingly he would only ask Wayne or Feltz about an unreconciled check if it were for a large amount. Power Lift had a practice of not mailing out checks if there was not enough money in the account to honor them. The Youngs or Feltz made the decision whether to hold a check.

Alan had a "hands off" attitude toward the finances, since he was not "a financial guy," but he was generally aware of Power Lift's cash flow problems. Neither he nor Wayne personally examined the books. When they had questions about a financial matter they generally asked Feltz. Feltz usually responded with an assurance that he had the situation in hand. The service manager stated that at one point he saw a stack of unpaid bills in a drawer in Feltz' desk, along with something that looked like a tax return.

In late September 1991, Wayne ordered Hodgetts to make an investigation of the state of Power Lift's finances and tally up the assets and outstanding obligations. During the course of this investigation, Hodgetts found that the checks and returns for Power Lift's taxes from March 1991 to September 1991, along with checks to pay other Power Lift liabilities, had never been mailed. The reported tax liability was $61,975.74. He retrieved the checks from Feltz. Hodgetts corrected the books to reflect the unpaid taxes. Wayne signed the late returns over Feltz' partially erased signature and filed them by December 1991.

Wayne called a meeting of the board on October 4, 1991, to discuss the company's financial situation. At the meeting, the unpaid obligations were disclosed. The company had about $45,000 in available funds. The Youngs decided to file for reorganization under chapter 11 of the Bankruptcy Code (11 U.S.C. § 101 *et seq.* (1988)) and to strip Feltz of all financial authority. Most of the available cash was used to retain a bankruptcy attorney.

On October 11, 1991, Power Lift filed its petition for reorganization. According to the petition, Power Lift had assets of $5,950,000 and liabilities of $5,685,000. Power Lift filed a plan of reorganization on March 20, 1992. Under the plan all tax obligations were to be paid. However, the plan was rejected by the creditors, in particular the tort claimant. Accordingly, Power Lift was forced to change to a chapter 7 bankruptcy proceeding and sell all its assets.

In July 1992, Power Lift sold its aerial lift division for $1,941,157. In March 1993, Power Lift sold its lift-truck division for $1,603,000.

During this period Power Lift paid Nissan $266,000 and paid Mitsubishi $37,000. It continued to pay rent to JWA before and during the bankruptcy and continued to pay the Youngs' salaries. The Department was not paid.

On October 19, 1994, the Department issued notices of penalty liability to the Youngs and Feltz totaling $103,595.88, representing the unpaid tax, penalty and interest. The penalties were assessed pursuant to section $13^{1}/_{2}$ of the Retailers' Occupation Tax Act (Ill. Rev. Stat. 1991, ch. 120, par. $452^{1}/_{2}$ (repealed effective January 1, 1993; replacement provision enacted as section 3—7 of the Uniform Penalty and Interest Act (35 ILCS 735/3—7 (West 1996)))), for wilful failure of a responsible officer to remit ROT taxes. The penalties covered the periods from March 1991 to September 1991, August 1992 through September 1992, and December 1992. All but $9,157.34, however, was for the period from March 1991 until September 1991.

Feltz and the Youngs administratively protested the penalties. On March 14, 1996, Wayne Young died. The ALJ granted the Department's request to substitute his estate as defendant. Wayne's sister Candace was named the executor of the estate. The administrative hearing was convened on April 8, 1998. Alan, Feltz, Hodgetts and O'Malley all testified, along with a former Power Lift service manager. At the hearing Feltz denied that he had any responsibility for the filing of taxes at Power Lift. The ALJ found that this was false. The ALJ issued a decision on August 13, 1998, recommending that the penalties be upheld, and the Director accepted the recommendation on October 19, 1998.

The ALJ found that the penalties against the Youngs were justified on the basis that: (1) the Youngs had recklessly ignored the danger that taxes were going unpaid during the period before Hodgetts turned up the checks that had been withheld; and (2) during the period after the checks were discovered, the Youngs paid other creditors, including themselves, without paying the Department.

Alan and Wayne's estate then petitioned the circuit court for administrative review. The circuit court issued a memorandum decision on July 15, 1999, upholding the Department's decision. The court found that the finding of wilfulness was justified on the basis of the reckless disregard of the possibility that taxes were not being paid before the unsent checks were discovered. The circuit court did not address the Youngs' conduct after the discovery.

On August 3, 1999, Alan and Wayne's estate filed a notice of appeal in the circuit court. On August 8, 1999, the Department filed a motion for entry of a judgment order. On August 11, 1999, the circuit court entered a memorandum of judgment and a judgment order.

## ANALYSIS

### I

The Department argues that this court does not have jurisdiction to hear the appeal of Alan and Wayne's estate (collectively, the Youngs) because the notice of appeal was premature. We disagree.

■ Appellate jurisdiction is conferred by the filing of a notice of appeal in the circuit court.

> "Every final judgment of a circuit court in a civil case is appealable as of right. The appeal is initiated by filing a notice of appeal. No other step is jurisdictional. An appeal is a continuation of the proceeding." 155 Ill. 2d R. 301.

The notice of appeal in the instant case was filed August 3, 1999. The notice stated:

> "The Estate of Wayne Young, Candace Young, Executor, and Alan Young, by their attorney Richard L. Manning, hereby appeal to the Illinois Appellate Court, First District, the final order of Judge Alexander P. White dated July 15, 1999 holding that they wilfully failed to file or pay Power Lift Inc.'s sales tax liabilities for the months of March 1991 to September 1991, and September, November, and December, 1992.
>
> Plaintiffs pray that the Illinois Appellate Court, First District, reverse such decision, and find that plaintiffs did not wilfully fail to file or pay such tax."

A judgment appealed from must be final for us to have appellate jurisdiction, unless the judgment comes within one of the exceptions for interlocutory orders in the supreme court rules. *Findley v. Posway*, 118 Ill. App. 3d 824, 827, 455 N.E.2d 861, 863 (1983). If there is no jurisdiction we cannot make a decision on the merits, even if the parties make no objection. *Mid City Wholesale Grocers, Inc. v. Bischoff*, 327 Ill. App. 268, 269, 64 N.E.2d 234 (1945).

The Youngs argue that we could hear the appeal even if we were to determine that they filed the notice of appeal prior to the final judgment. In support of this argument, the Youngs cite *Maywood-Proviso State Bank v. Village of Lisle*, 234 Ill. App. 3d 206, 599 N.E.2d 481 (1992). In *Maywood-Proviso*, the trial court entered an order on May 28, 1991. Then on June 10, 1991, the court amended it by adding Rule 304(a) language to make the prior order appealable. The plaintiffs filed a notice of appeal on August 28, 1991. In the notice of appeal, they specified the May 28 order, but not the June 10 order. The appeals court found that this was an excusable oversight, however. The court held that any deficiency was one of form, not of substance, and could be overlooked. *Maywood-Proviso*, 234 Ill. App. 3d at 215, 599 N.E.2d at 488. Notices of appeal are to be given a liberal construction

(*March v. Miller-Jesser, Inc.*, 202 Ill. App. 3d 148, 157, 559 N.E.2d 844, 849 (1990)), and mere technical defects in form are not fatal, especially in the absence of prejudice to the other party (*Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 434, 394 N.E.2d 380, 383 (1979)).

In *Maywood-Proviso*, the notice of appeal was filed after the final order. The notice merely designated the wrong order. But it was the substance of the order it mentioned, rather than the later order that merely added Rule 304(a) language, that the unsuccessful party wished to appeal. *Maywood-Proviso*, 234 Ill. App. 3d at 215, 599 N.E.2d at 488. This was a formal deficiency that caused no prejudice to the opposing party.

■ When a notice of appeal not only specifies the wrong order but is also filed prior to the appealable order, it is not effective to confer jurisdiction. Although we liberally construe the contents of the notice of appeal, this court does not have authority to excuse compliance with the filing requirements of the supreme court rules governing appeals. *Mitchell v. Fiat-Allis, Inc.*, 158 Ill. 2d 143, 150, 632 N.E.2d 1010, 1012 (1994). In *Texaco, Inc. v. Barnes*, 60 Ill. App. 3d 696, 377 N.E.2d 187 (1978), for example, the defendant in a forcible entry and detainer suit filed a notice of appeal after the court had announced its decision in favor of the plaintiff, but before the judge made the order final by reducing it to writing and signing it. Since the notice of appeal was filed approximately a week before the final order was entered and no attempt had been made subsequently to amend the notice of appeal, the appellate court held that it lacked jurisdiction to hear the appeal. *Texaco*, 60 Ill. App. 3d at 699, 377 N.E.2d at 189.

■ Nevertheless, in the instant case, we believe the July 15 order was final. A final judgment, order or decree is one that disposes of the merits of the case so that if affirmed the trial court has only to proceed with the execution of judgment. *Findley*, 118 Ill. App. at 826, 455 N.E.2d at 863; 2 Ill. L. & Prac. *Appeal & Error* § 106 (1953).

In the case *sub judice*, the circuit court issued a "Memorandum Decision and Judgment" on July 15, 1999. The order concludes:

> "The Court determines the finding of the Director, affirming the finding of the ALJ, that Plaintiffs willfully failed to file or pay Power Lift's sales tax liability, was not against the manifest weight of the evidence.
>
> The decision of the Department is confirmed."

On August 3, 1999, the Youngs filed a notice of appeal in the circuit court. On August 8, 1999, the Department filed a motion with the circuit court for entry of a judgment order. On August 11, 1999, the circuit court entered a memorandum of judgment and a judgment order. The memorandum of judgment read:

"On August 11, 1999, Judgment for unpaid taxes, penalties and interest was entered in favor of Defendants, The Illinois Department of Revenue of the State of Illinois and Kenneth E. Zehnder, Director and against Plaintiffs, Estate of Wayne Young, and ALAN YOUNG, in the amount of ONE HUNDRED THIRTY ONE THOUSAND, THREE HUNDRED EIGHTY FIVE and 53/100 DOLLARS, ($131,385.53) plus statutory interest."

The judgment order stated:

"1. This court's Memorandum Decision and Judgment entered July 15, 1999 is adopted and incorporated in its entirety.

2. For the reasons set forth in the Memorandum Decision and Judgment, the Department of Revenue's final administrative decision is affirmed.

3. Pursuant to Section 3—111(a)(8) of the Code of Civil Procedure, 735 ILCS 5/3—111(a)(8), judgment is entered in favor of the Defendants, Department of Revenue of the State of Illinois, and Kenneth E. Zehnder, Director of the Illinois Department of Revenue, and against the Plaintiffs, Estate of Wayne Young and Alan Young, in the amount of $131,385.53 which consists of:

| Tax | - | $ 66,977.00 |
| Penalty | - | $ 9,058.00 |
| Interest | - | $ 55,350.53 (through 8/11/99) |
| | | $131,385.53 |

4. Post Judgment interest shall accrue at the statutory rate per year.

5. This is a final and appealable order."

In our view, the July 15 order was a final order. The only information of any consequence contained in the August 11 orders and not in the July 15 order is the summary of the judgment amount. However, the July 15 order incorporated by reference the judgment of the Department. The Department's decision affirmed the notices of penalty liability which were in evidence and contained the tax penalty and interest figures. The figures for the unpaid tax and the penalty are the same in the notices of penalty liability and the August 11 "judgment order." Admittedly, interest had accrued since the entry of the Department's decision. The Department's decision stated that interest would continue to accrue at the statutory rate. But the August 11 "judgment order" also provided that interest would continue to accrue. The appropriate amount of interest would have to be calculated at the time of execution in any case. There was no lack of information

in the July 15 order that would have prevented the Department from proceeding to execution.

■ The Department filed a motion for judgment after the July 15 order, but this did not serve to vitiate the notice of appeal. If the Department had filed a posttrial motion directed against the judgment, then the Youngs would have been required under Supreme Court Rule 303(a)(2) to file a new notice of appeal after that motion was decided. 155 Ill. 2d R. 303(a)(2). But for a motion to qualify as a posttrial motion under Rule 303(a)(2), it must request one of the statutorily authorized types of relief consisting of rehearing, retrial, modification or vacation of the judgment. *Giammanco v. Giammanco*, 253 Ill. App. 3d 750, 755, 625 N.E.2d 990, 995 (1993). Even if the motion requests the court to modify the judgment, it must be "directed against the judgment" in order to constitute a posttrial motion for the purposes of Rule 303. *Giammanco*, 253 Ill. App. 3d at 755, 625 N.E.2d at 995. Accordingly, we hold that the notice of appeal was filed after the final order and, as a result, this court has jurisdiction of the appeal.

## II

■ Both parties have agreed that the question of wilfulness under the ROT Act is a mixed question of fact and law and that the appropriate standard of review is whether the finding is clearly erroneous, as the Illinois Supreme Court suggested might be the case in *Branson v. Department of Revenue*, 168 Ill. 2d 247, 265-66, 659 N.E.2d 961, 970 (1995), citing T. O'Neill & S. Brody, *Taking Standards of Appellate Review Seriously: A Proposal to Amend Rule 341*, 83 Ill. B.J. 512, 518 (1995). Accordingly we employ that standard.

■ A finding of wilfulness under section 131/2 does not require a showing of actual knowledge of nonpayment. Reckless disregard for obvious or known risks will suffice. *Branson*, 168 Ill. 2d at 255, 659 N.E.2d at 965. If a responsible person in a position to easily discover nonpayment clearly ought to have known of a grave risk of nonpayment but did nothing, a finding of wilfulness is justified. *Branson*, 168 Ill. 2d at 255, 659 N.E.2d at 965.

■ The Department may establish a *prima facie* case of wilfulness by submitting a certified record of tax penalty, as the Department did in the instant case. Once the *prima facie* case has been established, the burden rests on the taxpayer to establish through sufficient evidence that the nonpayment was not wilful. *Branson*, 168 Ill. 2d at 261-62, 659 N.E.2d at 968.

The Youngs contend that they did not wilfully fail to pay Power Lift's sales tax liabilities. Appellants cite *Branson v. Department of*

*Revenue*, 168 Ill. 2d 247, 659 N.E.2d 961 (1995), and *Department of Revenue v. Marion Sopko, Inc.*, 84 Ill. App. 3d 953, 406 N.E.2d 188 (1980). In our view, appellants' reliance on these cases is misplaced.

In *Branson*, the plaintiff owned a restaurant in Carbondale near the Southern Illinois University campus. He had a bookkeeper to handle the restaurant's finances, including the payment of taxes. During the summer of 1986, the restaurant had cash flow problems, but the situation seemed to improve in the fall, when the students returned to the campus. In December, the bookkeeper went on vacation and the plaintiff took over the finances. Soon, a bank official contacted him to inform him that the restaurant's bank account was overdrawn. Suppliers began to complain that the restaurant's checks were being returned for insufficient funds. The plaintiff discovered a drawer of unpaid bills and discovered that the bills had not been paid in three months. He did not, however, find evidence of unpaid taxes at that time. The business operated for a short time on a cash-only basis and then shut down in January 1987. At that time, the Department of Revenue informed the plaintiff that there was a tax deficiency.

The plaintiff was issued a notice of penalty liability, which he protested before the Department. The ALJ found that the plaintiff had wilfully failed to pay the taxes. The circuit court reversed on administrative review. Then the appellate court affirmed in part and reversed in part. The appellate court held that there was not evidence that the plaintiff had wilfully failed to withhold taxes before December 1986. The evidence did, however, support the finding of wilfulness for the period starting in December 1986. For the period before December 1986, there was no evidence that the plaintiff knew or should have known that the ROT taxes were not being paid. The Department did not appeal the appellate court's ruling on this issue. As for the period starting in December 1986, however, the Illinois Supreme Court affirmed the appellate court's decision, writing:

> "[W]hen plaintiff learned that the corporate account was overdrawn and unpaid bills were piling up, plaintiff was on notice that the corporation's finances were seriously compromised. Plaintiff had a concomitant obligation to insure that the retailers' occupational tax returns were filed and the taxes remitted from that time forward, as he wound down the business." *Branson*, 168 Ill. 2d at 264, 659 N.E.2d at 969.

The appellate court held that reliance on the system in place for paying taxes appeared reasonable before December 1986. *Branson*, 168 Ill. 2d at 263, 659 N.E.2d at 969. From December on, however, the plaintiff was on notice.

■ Similarly, in this case, there was a system in place for paying

taxes, as well as a policy of paying taxes first. At some point it may have been reasonable to rely on that system. However, by 1991, it was common knowledge that the company was in serious financial difficulty and bills were going unpaid. Although Power Lift's system for paying taxes may have been good on paper, Alan knew that the accounting was "screwed up" and that the comptrollers they hired could not seem to straighten things out. In our view, it was not clear error for the Department to find that, by 1991, the Youngs were on notice and that they had a duty at that time to insure that ROT returns were filed and the taxes paid.

The evidence as to whether Wayne knew or should have known of the grave risk of nonpayment was not as clear as the evidence for Alan, in part because he did not testify. However, the Department established its *prima facie* case and the burden was then on Wayne's estate to rebut the presumption of wilfulness. *Branson*, 168 Ill. 2d at 261-62, 659 N.E.2d at 968. We cannot say that it was clear error to find that the estate did not rebut the presumption of wilfulness. *Branson*, 168 Ill. 2d at 261-62, 659 N.E.2d at 968.

In *Marion Sopko, Inc.*, 84 Ill. App. 3d 953, 406 N.E.2d 188, the owner of a corporation received a notice of deficiency from the Department. He immediately contacted the accountant who filed the ROT returns for the company. The accountant told him not to worry about it and that he would take care of the matter. According to the owner there was no further reason for him to doubt that the taxes were paid. However, the taxes were not paid and eventually the Department filed suit. The trial court found that there was no evidence that the owner had wilfully failed to file the taxes for the period in question.

The appeals court affirmed the trial court's holding that it was reasonable for the *Sopko* defendant to rely on his accountant. But the primary basis of the ruling was the deferential standard of review (held to be manifest weight of the evidence in that case). "We are not free, as reviewing judges," the court noted, "to reweigh the evidence, and only when there is an absence of probative facts to support a conclusion reached does reversible error appear." *Sopko*, 84 Ill. App. 3d at 956, 406 N.E.2d at 190. In this case, however, the finder of fact held for the Department on the issue of wilfulness. Since "the trial judge as the trier of fact is in a superior position to hear and weigh the evidence and determine the credibility of witnesses" (*Sopko*, 84 Ill. App. 3d at 956, 406 N.E.2d at 190), we must treat that finding with deference.

Although in *Sopko* it may have been reasonable for the defendant to rely on his accountant, it is not always reasonable to rely on third parties. As the court stated in *Branson*:

"[W]e do not intend to imply that a corporate officer who is responsible for filing retailers' occupation tax returns and remitting the collected taxes may avoid personal liability under section 13½ merely by delegating bookkeeping duties to third parties and failing to inspect corporate records or otherwise failing to keep informed of the status of the retailers' occupation tax returns and payments." *Branson*, 168 Ill. 2d at 267, 659 N.E.2d at 971.

## III

■ The Department contends that a finding of wilfulness was justified because the Youngs paid other creditors of Power Lift, including themselves, without paying the Department. Preferring other creditors over the Department can constitute a wilful failure to pay a ROT liability. See *Department of Revenue v. Heartland Investments, Inc.*, 106 Ill. 2d 19, 476 N.E.2d 413 (1985). As the court noted in *Department of Revenue v. Joseph Bublick & Sons, Inc.*, 68 Ill. 2d 568, 369 N.E.2d 1279 (1977), with regard to section 13½:

"The reason for passing on the tax liability to the responsible officers is obvious. The corporate officers could employ the funds collected for the State to pay corporate obligations as well as salaries and bonuses to employees, and thus make recovery of the funds from a defunct corporation an impossibility." *Bublick*, 68 Ill. 2d at 575-76, 369 N.E.2d at 1283.

We agree with the Department that the ALJ's finding of wilfulness was supported by some of the instances of the Youngs preferring other creditors over the Department.

The Youngs argue that they did everything they could to pay the Department once they knew of the deficiency. They hired a bankruptcy lawyer and filed for bankruptcy under chapter 11. Under their proposed plan of reorganization, the Department was to be paid in full. The plan did not go through because the tort claimant creditor would not accept it.

The Department concedes that it was not improper for the Youngs to file for bankruptcy on behalf of Power Lift. Moreover, when the bankruptcy was converted to chapter 7, the Youngs no longer had enough control over who was paid. The liquidation of Power Lift did not produce enough cash to pay secured creditors.

However, although it was not improper for the Youngs to file for bankruptcy on behalf of Power Lift, the finding of wilfulness based on preferring other creditors can be justified because, after the Youngs knew of the deficiency, payments were made to creditors before the bankruptcy filing. The Youngs paid salaries, including their own, as well as rent to JWA properties, the partnership they owned with their father, for at least a week after they discovered the delinquency and

before they filed for bankruptcy. These payments were improper under *Heartland*.

Accordingly, we affirm the decision of the circuit court.

Affirmed.

GORDON and McBRIDE, JJ., concur.